## Franks' Ex'r et al. v. Bates et al.

May 12, 1939.

R. L. VINCENT, A. M. SAMUELS and WARD YAGER for appellants.

H. W. ALEXANDER and L. M. ACKMAN for appellees.

OPINION OF THE COURT BY JUDGE FULTON—Reversing.

This is an appeal from a judgment entered on the verdict of a jury finding a certain paper probated in the county court as the will of Mrs. Carrie M. Franks not to be her will.

J. T. Franks died in the spring of 1933 and left his entire estate to his wife, Mrs. Carrie M. Franks, who died on May 16, 1934. The will of J. T. Franks was contested by his daughter, the appellee, Mrs. Sallie Bates, but she was eventually unsuccessful in that contest.

The property devised by J. T. Franks to Carrie M. Franks consisted of the home farm of 138 acres valued at approximately $7,000, another farm of 194 acres valued at about $5,000, and personalty amounting to around $1,500. Mrs. Franks devised the 138-acre farm to Whit Jump, a stranger in blood to her, and also devised to him a pair of mules and a cow. She devised the remainder of her estate to her granddaughter, Nancy Evelyn Bates, the daughter of appellee, Sallie Bates. Mrs. Franks owed debts amounting to approximately $4,700 and certain claims are also pending against the estate, so that when the costs of administration are paid it is doubtful whether or not the granddaughter, Nancy Evelyn Bates, will receive anything under the will—if so, it will be a small amount. In her will Mrs. Franks states that she devises the farm to Whit Jump because her husband had requested her to do so and because he had assisted her and her husband for 33 years and was always ready to help them.

It appears that Whit Jump had worked for and lived with Mr. and Mrs. Franks a large portion of the time for more than 30 years before their death, but about two years before the death of J. T. Franks, he had moved out and was living at the home of a brother-

in-law near the Franks residence. Several witnesses testified that Mr. Franks told them that he had run Whit Jump off because he was trying to break up his home.

After the death of Mr. Franks, Mrs. Bates instituted a proceeding in the county court in the attempt to declare Mrs. Franks incompetent and have a committee appointed to manage her estate. This proceeding was dropped when physicians appointed to examine Mrs. Franks certified that she was of sound mind. In August, 1933, Mrs. Bates and her family were living with Mrs. Franks and it appears that she was desirous of having them move out. In consideration of their doing so, Mrs. Franks entered into a contract by which she gave Mrs. Bates the right to manage and control the two farms and apply the income to the support of Mrs. Franks and any balance remaining to the payment of debts. Pursuant to this contract Mrs. Bates rented the 194-acre farm to a tenant and later attempted to dispossess him by a forcible detainer proceeding. Mrs. Franks intervened in this proceeding, alleging that the contract above mentioned was obtained from her by Mrs. Bates by duress, and on the trial of this issue judgment was rendered cancelling the contract.

Immediately after Mr. and Mrs. Bates moved out of Mrs. Franks' home, Whit Jump moved in with her and continued to reside there until the time of her death. The transaction has every appearance that the testatrix wanted to get Mrs. Bates out in order to get Jump in. Mrs. Bates employed a woman to help Mrs. Franks around the home and look after her and this woman also resided at the Franks home a large part of the time.

The evidence establishes beyond question that Mrs. Franks was a morphine addict up to the year 1930, but appellants contend there was no satisfactory evidence that she was addicted to the use of morphine after that time. We think, however, the weight of the evidence establishes that she was a morphine addict up to the time of her death. Dr. Fenton T. Adams of Latonia testifies positively that she was and a drug clerk who was called as a witness for appellants also states that she was an addict. Testimony of neighbors also serves to corroborate the testimony of these two witnesses.

It is appellants' contention that the evidence was insufficient to warrant a submission to the jury either on the ground of mental incapacity or undue influence, but

that even if it was, the verdict is flagrantly against the evidence.

On the question of mental capacity, three witnesses testified for appellee that the testatrix did not have sufficient mind to comprehend the nature and character of her estate, the objects of her bounty, and dispose of her estate according to a fixed purpose of her own. Two of these were lay witnesses, but one of them was a physician, Dr. Fenton T. Adams, qualified as a medical witness having special qualifications along this line. This witness was very positive that Mrs. Franks was mentally feeble and was afflicted with senile dementia. He said that she was suffering from senile dementia even as far back as 1930 and that this was a brain disease which progressed with age and was aggravated by the testatrix's addiction to morphine and her use of whiskey to excess. This witness says that a short while before her death testatrix came to his office and at that time was under the influence of morphine and acted like a child one year old. It also appears from his testimony, which is also a matter of common knowledge, that one addicted to the use of morphine is easily influenced and controlled by any person furnishing her morphine.

The numerical weight of the testimony on this issue of mental capacity is undoubtedly on the side of appellants, as a large number of neighbors testified that in their judgment her mind was good and that she was perfectly capable of knowing the nature of her estate and the objects of her bounty and disposing of it according to a fixed purpose of her own. Two or three doctors also testified that in their judgment she was of sound mind and capable of making a will. However, we cannot be governed in passing on this question by the numerical weight of the testimony, or, in fact, by the weight of the testimony in any way unless the verdict is so flagrantly against the evidence as to indicate passion and prejudice on the part of the jury. Considering the testimony on this issue as a whole, and assuming that the jury found against the will on the ground of mental incapacity, we are of the opinion that the verdict was not so flagrantly against the evidence as to indicate that it was brought about as a result of passion and prejudice on the part of the jury.

On the question of undue influence, quite a number of neighbors and acquaintances of the parties testified

that they had had opportunity to observe the relations between the testatrix and Whit Jump and that in their judgment she was under his influence and control. As a number of them put it, "she would mind him" and "seemed to be afraid of him" and "acted nervous," and that "he appeared to be the boss" around the house. It must also be remembered that there existed a perfect setting for an opportunity for Jump to exercise undue influence over the testatrix. As pointed out by Dr. Adams, a person addicted to the use of morphine is an easy victim of one having the opportunity to exercise control or influence by assisting or helping the addict to obtain the morphine. Although it is not shown directly that Jump did assist the testatrix in procuring narcotics, yet he was in a better position to do so than any other person. We readily concede the soundness of appellants' contention that the mere opportunity to exercise undue influence is not sufficient and that something more than opportunity must be shown. This principle has been enunciated in this court many times. Brent v. Fleming, 165 Ky. 356, 176 S. W. 1134; Seals v. Seals, 213 Ky. 779, 281 S. W. 982; Bennett v. Bennett's Executor, 244 Ky. 394, 51 S. W. (2d) 241. But, in addition to the character of testimony mentioned above, Mrs. Bates and her daughter, Nancy Evelyn Bates, both testify that on April 21, 1934, just three days before the will was executed, Mrs. Franks said to them: "Children, there is a party trying to get me to make my will and not leave you a thing, and I told them they did not know what it was all about, they did not have any children." Mrs. Cassie Pettit testified that about the last of April or the first of May, a few days after the will was written, Mrs. Franks told her: "I am just so nervous I don't know what I am doing; I signed some papers and I don't know what I signed." It is true that the testatrix in these conversations did not mention the name of Whit Jump, but undoubtedly under the circumstances the jury had a right to arrive at the conclusion that Jump was the party referred to by the testatrix. While Mrs. Franks, in her statement to Mrs. Pettit, did not mention Jump, it is a very significant circumstance, entitled to be considered by the jury.

When all the circumstances of this case are considered, it seems that it was unnatural that the testatrix should have devised practically all of her property to a stranger in blood to the exclusion of her own daugh-

ter, even though she recites in her will that her husband had requested her to give the farm to Jump. It is true that hard feeling seemed to have sprung up between Mrs. Franks and her daughter due to the litigation over the contract, but most of the antagonism seems to have developed after Jump took up his residence with Mrs. Franks. Mrs. Bates accounts for this antipathy of her mother towards her by saying that she was continually protesting to her about her use of morphine and whiskey and that her mother resented her protests against those habits. It appears, also, from the testimony of other witnesses, that Mrs. Franks had expressed her love and the kindest feelings for Mrs. Bates prior to the time that Jump took up his residence with her, but that some months thereafter her attitude towards her daughter had undergone a profound change. Witnesses also relate that Jump frequently made to Mrs. Franks derogatory remarks concerning Mrs. Bates, calculated to prejudice the testatrix against her daughter.

If a will is unnatural in its provisions and inconsistent with the obligations of the testator to his family, the burden rests upon the propounders to give some reasonable explanation of its unnatural character. Walls v. Walls, 99 S. W. 969, 30 Ky. Law Rep. 948; Helm's Guardian v. Neathery, 226 Ky. 42, 10 S. W. (2d) 474. Considering all this testimony, taken together with the fact that the testatrix devised practically all of her property to one who was a stranger in blood to her to the exclusion of her own child, we are of the opinion that the evidence was sufficient to go to the jury on this question and to sustain the verdict.

We come now to the final and most serious contention made by appellant, which is that the court permitted the contestants to introduce certain incompetent evidence. During the examination of a number of witnesses introduced by appellees, the following question in substance was propounded to them:

"I want you to tell the jury whether or not, according to your best judgment based upon your observation of their relationship and the attitude of Mrs. Franks toward Whit Jump, you believe that Mrs. Franks would have made a will disposing of her property contrary to the wish of Whit Jump."

All of those witnesses answered "no" to this question or that they did not believe that she would have

done so. During the examination of another witness, this question was asked:

"Knowing Mrs. Franks and what you have seen and have testified to, tell the jury whether or not, in your opinion, that she would make a will just the way Whit Jump wanted her to make it."

To this question the witness gave an affirmative answer.

These questions assume that Jump had a wish or desire that the testatrix make a will in his favor and that he had communicated this wish or desire to her. They pass beyond the bounds of calling for an opinion on the part of the witnesses as to influence or domination of the testatrix by Jump based on facts observed and related by them, and call for a pure guess or conjecture on the part of the witnesses. It is doubtful even if a mental specialist or psychiatrist who had opportunity to observe the relationship and conduct of the parties could be permitted to answer a question of this type, but it was clearly improper to permit ordinary lay witnesses to express a conjecture or guess on such a matter. This character of evidence is so plainly incompetent that no elaboration or argument is necessary to demonstrate it and, being incompetent, was highly prejudicial to the contestees and such as to call for a reversal of the judgment.

The judgment is therefore reversed with directions to grant a new trial and for further proceedings in conformity with this opinion.