**MARCUM et al. v. GALLUP.**

Court of Appeals of Kentucky.
March 16, 1951.

Dysard & Dysard, Ashland, Hal Marcum, Huntington, W. Va., for appellant.

Davis M. Howerton, Ashland, George Gallup, Catlettsburg, for appellee.

STANLEY, Commissioner.

The holographic will of the late Mrs. Blanche Marcum Mims has been contested by her niece, Mrs. Eleanor Marcum Trout, and her nephew, Kermit Marcum, her only immediate heirs, upon the ground that the instrument was not wholly in the handwriting of the testatrix and that it was executed through undue influence of or in behalf of the beneficiary, her second cousin, Mrs. Blanch Bromley Kirby. The will bequeathed $500 in trust for the care of cemetery lots. It then reads: "Second—I hereby give and bequeath to my niece Eleanor Marcum Trout one dollar and to her brother Kermit Marcum one dollar—all the rest of my property, personal or mixed and wheresoever situated or which I may be the owner at the date of my death—is to go to my cousin Blanch Bromley Kirby, of Columbus, Ohio."

The petition of contest pleaded in the alternative if the instrument should be held to be a valid will, that properly construed it did not devise her real estate to Mrs. Kirby. Being required to elect, the petitioners chose to prosecute the contest. The court submitted to the jury only the issue of the instrument being in the testatrix' handwriting, thereby holding that the evidence of undue influence was insufficient. The verdict was in favor of the will. The contestants appeal.

Several bankers and other persons fully qualified from a knowledge of the decedent's handwriting testify that it is all genuine. Mrs. Banks, who had been housekeeper and nurse of the testatrix, testified that she had told her she had written her will and where she had put it. The witness found the instrument there. The only evidence on the other side is that of a Cincinnati expert in handwriting. He made a somewhat exhaustive analysis and gave the opinion that the will was not in Mrs. Mims' handwriting. He was very sure it had been carefully copied. He pointed out evidence of conscious writing or penmanship as distinguished from automatic or instinctive writing, as where one has his mind on the subject matter rather than on the formation of the letters or words. He would not undertake to say, however, whether or not all the writing was that of the same person. The appellants do not press the argument very hard that the evidence was not sufficient to sustain a verdict on this point but submit that upon a comparison of the will, with admitted specimens, its several characteristics indicate that it was copied by a skillful hand. We doubt very much that the testatrix had composed this instrument for it is in somewhat technical language, but we readily conclude that the question of whether it was in her handwriting was one for the jury to determine.

The principle argument is that the evidence required that the jury should determine whether or not the will "was the influenced product of an aged and unstable lady." We address ourselves to that point with a brief summary of the evidence.

As usual, in cases of this kind, the evidence covered a wide range with many details. The testatrix was a childless widow. Her nearest relatives were the contestants, the daughter and son of a deceased brother who was blind and to whom the sister had been devoted. The contestee, Mrs. Kirby, was one of several second cousins and, as indicated, resided in Columbus, Ohio. Her attention came very late. Mrs. Mims had lived for many years in Catlettsburg. Mrs. Trout lived in Ashland about five miles away. The testatrix was a cripple and over 80 years old when she died in October, 1947. Mrs. Mims had wanted to adopt her niece when she was a child. Although that was not done, all the time she had occupied the relation of an affectionate and atten-

tive daughter. There was an exceptional bond of affection and intimate association. In the interest of brevity, we omit the details of the long record of instances of devotion and loving care and attention. Likewise, the expressions of appreciation by the aunt. As she grew older, she became queer and eccentric, very secretive, hard to please, feared poverty, imagined that someone was always trying to poison or otherwise kill her. There is much of this in the record. When routed from her home by a flood in 1945, she had been taken into the home of her niece at great inconvenience to herself and family. But she was not satisfied because she wanted to live at Catlettsburg and to be near the cemetery. She was then taken into the home of a cousin, Mrs. Eunice Calvert, in Ceredo, West Virginia, just across the river from Catlettsburg. Her exacting demands and eccentricities were extreme. Within a few weeks she was again calling upon Eleanor, her niece, for help. She purchased a home in Catlettsburg in the fall of 1945. Mrs. Trout gave her $1,500 of the purchase price. She took no note or other evidence of this or of many other advancements, since her aunt had always told her that what she had would go to her on her death. From the constant care and attention which had been bestowed upon the aunt, we are inclined to believe Mrs. Trout spoke the truth in saying that in any event she would have been glad to have given the money to her aunt since she was her closest relative.

On the day she was taken to Ceredo by Mrs. Calvert and her husband, Mrs. Mims stopped at the office of a kinsman, Mr. William D. O'Neal, a lawyer. When she came out, she expressed to them her great satisfaction in having made her will so as to leave everything she had to Eleanor, that is, Mrs. Trout. There is evidence of statements to different persons through the years of her intention and purpose of doing that.

About this time Mrs. Trout's health was failing, but she continued her intimate relations and conversations over the telephone. Toward the end of her life there was a change in the old lady's attitude.

It was never indicated to her niece by word or by deed, but it was spoken of to Mrs. Banks, who had become her nurse and housekeeper. In telling her where she had her will, she had instructed Mrs. Banks that when she died she should immediately get it otherwise Eleanor would get hold of it and tear it up. She told her, "The lady she had it made to was the only one that cared for her or had come to see her." She had told Mrs. Banks that she should not let Eleanor in the house for "she didn't come to see her while she was living and she didn't want her looking on her face after she died." However, there had been constant telephone communications between the two and Mrs. Trout had been to see her at least twice during this period of concealed antipathy. To some callers she seemed to be sad over the fact that Eleanor was sick and could not come to see her.

Along in the latter part of 1945 the cousins, Mrs. Blanch Kirby and her mother, Mrs. Pearl Bromley, began coming down from Ohio to visit Mrs. Mims and to pay her much attention, bringing her candy and other gifts. Mrs. Kirby was there frequently. Before this, they had never visited her and she had never spoken of them to Mrs. Calvert or other close relatives with whom she was in contact. Mrs. Mims often told her niece over the telephone about her cousins being there and that they had suggested that she ought to break up her home and come to live with her. On an occasion when Eleanor visited her aunt she told her, "It just broke Blanch's heart and Pearl's heart the way I had neglected her, and they thought I ought to break up my home and come stay with her and take care of her." Further, "every time she talked" she would tell Mrs. Trout about how sorry Blanch felt about her having to stay there alone, but excused herself from staying with the old lady because "she has a terrible shoulder and has to go to the Cleveland Clinic and have her arm operated on" and that "Pearl (Mrs. Bromley) had an ear trouble and was in a serious condition." She reported that when she had told Mrs. Kirby that Eleanor was sick and could not come she made light of her condition and said that was no excuse.

When Mrs. Mims had died, Mrs. Kirby took over the house and attended to the funeral arrangements. Her niece, Eleanor, an intimate cousin, Mrs. Calvert, and other closer relatives living in Catlettsburg and Ashland learned of her death through the newspaper. Mr. Trout went to the house but was ignored until he told Mrs. Kirby that his wife was sick in bed and suggested that she call her. To this Mrs. Kirby responded that she didn't have anything to call her for.

 It is well settled law that, like other species of fraud, influence that results in the execution of a will which is not in truth the free expression and desire of the maker may be proved by a chain of circumstances. Ordinarily that is the case; often of necessity. Walls v. Walls, 99 S. W. 969, 30 Ky.Law Rep. 948; Barber's Executors v. Baldwin's Executor, 138 Ky. 710, 128 S.W. 1092. As stated in Livering's Executor v. Russell, 100 S.W. 840, 844, 30 Ky.Law Rep. 1185, "All that can be done is to prove certain acts and facts, and it is from these, when connected into a composite whole, that the evidence of undue influence is made to appear * * * [and the jury] had a right to weigh these facts for what they were worth." In the present case we have an eccentric old lady, easily persuaded and suffering hallucinations, radically changing an attitude of a lifetime, and that change based upon unreasonable grounds, although she at times seems to have understood that it was because of her own illness that the object of her affection could not come to see her. We have the belated appearance upon the scene of a second cousin who had previously never paid the old lady any attention and had scarcely been heard of. The circumstances supported by statements of the testatrix may have inclined the jury to believe their motive to have been ulterior. We have the statements of the testatrix indicating that the beneficiary and her mother had stirred up trouble and hostility which led her to regard as inexcusable what was in fact reasonable and excusable. We do not have mere opportunity for unduly influencing this unstable mentality but a disposition quite unnatural under the circumstances.

It is a disposition contrary to a purpose fixed and persistently expressed. Naturally, when such enfeebled mental condition exists as is here disclosed, it takes less activity and inducement to be regarded as undue influence and less evidence to prove that that actual or dominating factor prevailed. Stege v. Stege's Trustee, 237 Ky. 197, 35 S.W.2d 324. While usually applied specifically to cases where a child or other immediate natural object of one's testamentary bounty has been grossly discriminated against, it is a rule that if under all the circumstances, the will is unreasonable and unnatural in its provisions and inconsistent with the obligations of the testator, slight evidence is sufficient to take the case to the jury in the absence of reasonable explanation. Thus, it was written in the leading case of Walls v. Walls, supra, 99 S.W. 969, 971, 30 Ky.Law Rep. 948, as frequently quoted, "Incapacity opens the door to undue influence, and when opportunities for such influence are shown, and the favored devisees are the beneficiaries of a will unnatural in its provisions, to the exclusion of others having equal claims at least upon his bounty, very slight circumstances are sufficient to make the question of undue influence one for the jury." Of like effect are Helm's Guardian v. Neathery, 226 Ky. 42, 10 S.W.2d 474; Franks' Executor v. Bates, 278 Ky. 337, 128 S.W.2d 739; Berryman v. Sidwell, 278 Ky. 713, 129 S.W.2d 154; Kiefer's Executor v. Deibel, 292 Ky. 318, 166 S.W.2d 430.

 We do not go so far here as to say that that rule is applicable generally, but since the niece in this case had throughout the years occupied the relation of a devoted daughter, the unnaturalness of the will supplemented by the forceful story of events uncontradicted and unexplained, constituted, we think, sufficient evidence to take the case out of the realm of sheer suspicion and speculation. The circumstances tend to create a pattern of probability so impressive that the jury might well believe that the terms of the will are the fruit of undue influence upon the mind of the testatrix.

Wherefore, the judgment is reversed.