RENDERED:  MARCH 23, 2023
TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0390-MR

LAZARO POZO-ILLAS                                             APPELLANT

                  ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.                 HONORABLE ANGELA MCCORMICK BISIG, JUDGE
                           NO. 19-CR-002766

COMMONWEALTH OF KENTUCKY                         APPELLEE

**OPINION OF THE COURT BY JUSTICE LAMBERT**

**<u>AFFIRMING</u>**

Lazaro Pozo-Illas (Pozo-Illas) was convicted of wanton murder, first-degree assault, two counts of first-degree wanton endangerment, operating a motor vehicle while under the influence of alcohol, and operating a motor vehicle without an operator's license.  He was sentenced to thirty years' imprisonment and now appeals his convictions and sentence to this Court as a matter of right.[1]  After review, we affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On Sunday, August 11, 2019, Chris Shultz (Chris) and Brian Hovekamp (Brian) went golfing together at Seneca Golf Course in Jefferson County.  The

---

[1] Ky. Const. § 110(2)(b).

golf course is a public course located in Seneca Park, which is also open to the public. The course has eighteen holes, and its front nine holes are separated from its back nine holes by a two-lane road. In order to get from the front nine to the back nine, golfers must cross Pee Wee Reese Road using a marked golf cart path. During the relevant time in this case, the cart path was marked with standard, vertical, white crosswalk lines that ran from one side of Pee Wee Reese Road to the other. The cart path was also marked with a yellow diamond shaped road sign with a golf cart on it with an arrow pointing to the cart path beneath it. Beneath the golf cart warning sign was a twenty-five miles per hour speed limit sign.

At 3:56 p.m. Chris and Brian finished the front nine holes and were using the cart path to cross Pee Wee Reese Road to reach the back nine holes. As they were crossing, their golf cart was t-boned by a 2006 Ford Mustang that was driven by Pozo-Illas. Brian, the driver of the golf cart, was severely injured but survived the collision. Chris, the passenger, tragically died due to multiple blunt force injuries. Surveillance footage of the collision showed that Brian did not stop before entering the cart path and did not stop at any time while in the cart path. After striking the golf cart, the Mustang continued moving forward, veered left off the road, and came to rest in very tall, thick grass.

There were a number of bystanders that witnessed the collision and its aftermath. One of the witnesses, Tyler Cissell (Tyler) was in a golf cart directly behind Chris and Brian when the collision occurred. After the collision, Tyler went to the Mustang to ensure that its occupants did not leave the scene.

2

Tyler saw the individual in the front passenger seat toss a case of beer out the window into the tall grass. Police officers would later recover a full twelve pack of beer out of the grass which was still "cold and sweaty."

Several police officers and other first responders arrived on scene soon after the collision. Officer Aaron Flannery spoke to Pozo-Illas and his two passengers shortly after arriving. In body camera footage of the interaction Pozo-Illas made the following statement: "I'm driving over here, I'm driving through here, I just coming, and he just, I know that this over here they play golf over here, but he see, he see I coming and he just stop. I can't stop too because that's a standard, it's a shift [unintelligible]."

Later, Officers Bassler and Tello conducted a series of field sobriety tests on Pozo-Illas, which were also captured on body camera footage. The officers first established that Pozo-Illas preferred to communicate with them in Spanish. Thereafter, Officer Bassler communicated with Pozo-Illas in English and Officer Tello translated. To begin, the officers asked Pozo-Illas how much he had to drink that day. He responded that he drank a "small bottle" of Hennessy. Officer Bassler then conducted the horizontal gaze nystagmus test, colloquially known as the "involuntary eye jerk test"; the "walk and turn" test; and the "stand on one leg" test. Officer Bassler would later testify that these tests are not "pass/fail," but rather an officer looks for indicators of impairment. Officer Bassler believed that Pozo-Illas showed indicators of impairment on each of the tests. Last, Officer Bassler attempted to determine Pozo-Illas' blood alcohol content (BAC) using a portable breathalyzer test.

3

Officer Bassler attempted the test three different times and during the second attempt, the officer told Pozo-Illas that the device was indicating that he was trying to block it with his tongue. The results of that portable breathalyzer test were not submitted to the jury.

After completing the field sobriety tests, Officer Bassler placed Pozo-Illas under arrest. He was then transported to jail, where an three additional BAC tests were performed: an Intoxilyzer breath test and two blood draws. The Intoxilyzer test was performed at 6:02 p.m., approximately two hours after the collision. The results of that test showed that Pozo-Illas' BAC was 0.160. The first blood draw occurred about ten minutes after the breath test, the results of which were a BAC of 0.161. The second blood draw was taken exactly one hour later and showed that Pozo-Illas' BAC was 0.141. Dr. Greg Davis, a witness for the Commonwealth, testified that based on a retrograde extrapolation formula Pozo-Illas' BAC at the time of the collision would have been 0.195. Dr. Davis explained that this BAC calculation was only an approximation and acknowledged that, because of the way the body metabolizes alcohol, his BAC could have been 0.195 at some point after the collision rather than at the exact time of the collision.

In addition to driving while impaired, Pozo-Illas was also speeding at the time of the collision. Officer Bryan Gillis testified that the crash data retrieval (CDR) report from the Mustang recorded that for the twenty seconds that the preceded the collision the vehicle's speed steadily remained between fifty and sixty miles per hour, that the brakes were applied 1.4 seconds before the

4

collision, and that at the time the brakes were applied Pozo-Illas was driving at a rate of fifty-three miles per hour. At impact, the vehicle was travelling at twenty-nine miles per hour.

In order to reach the area where the collision occurred, Pozo-Illas had to turn right at an intersection on Taylorsville Road and go north on Pee Wee Reese Road. Several videos of the route were played for the jury. At the beginning of the road there was a twenty-five miles per hour speed limit sign. After a short distance there was a pedestrian crosswalk with two pedestrian crosswalk signs. Immediately after the pedestrian crosswalk the road began to go up a blind hill. Towards the top of the hill there were a single set of rumble strips in the middle of the driving lane, and at the top of that hill was the cart path where the collision occurred.

At trial, Pozo-Illas argued that he did not intend harm anyone that day, and that his conduct was not wanton but merely negligent. He asserted that he could not see the cart path until he reached the top of the blind hill, and that even then all he could see was the golf cart warning sign. Through cross-examination of one of the police officers involved in the case, defense counsel established that the golf cart warning sign was neither a stop sign nor a yield sign but was instead an advisory sign only. Pozo-Illas therefore contended that he should not be convicted of murder for failing to respond to a "dart out" in time. Pozo-Illas acknowledged that he was speeding but argued that the CDR data should only be considered rough estimates, as the Mustang was an older model and there was no evidence that the CDR was working properly or had

5

been recently calibrated. Similarly, he did not dispute that he had been drinking but argued that the field sobriety tests could have been skewed if he had been hit in the head when the airbags deployed during the collision, and, that he was not as impaired as the Commonwealth asserted.

The jury ultimately convicted Pozo-Illas of the wanton murder of Chris; the first-degree assault of Brian; two counts of wanton endangerment, one for each of his passengers; operating a motor vehicle while under the influence of alcohol; and operating a motor vehicle without an operator's license.

Additional facts are discussed below as necessary.

## II. ANALYSIS

Pozo-Illas asserts several arguments to support his contention that his convictions should be vacated, we will address each in turn.

### A. The trial court did not err by excluding evidence for lack of relevance as to additional signage placed in the cart path after the date of the collision.

At some point after the collision, additional signage and safety measures were implemented at the cart path. Three poles running the length of the cart path at even intervals were added to each side of it. And, about ten yards away from the cart path on either side, two poles separated by a white line were added across the road to indicate where a driver should stop when letting a cart or pedestrian cross the cart path. Finally, an additional sign was placed in front of, and in addition to, the golf cart warning sign. The added sign is a white, square sign with a yield symbol on it that reads "yield here to" with a pedestrian symbol and an arrow pointing to the cart path.

6

The Commonwealth filed a motion in limine to exclude any evidence of these additional safety measures. In support, the Commonwealth cited KRE[2] 407, which prohibits the admission of evidence of subsequent remedial measures "which, if taken previously, would have made an injury or harm allegedly caused by the event less likely to occur" to prove "negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction."[3] KRE 407 allows the evidence of subsequent remedial measures if offered for another purpose, "such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment."[4] The Commonwealth further argued that the evidence was irrelevant and therefore inadmissible under KRE 402.

In response, defense counsel asserted that KRE 407 applies only in civil cases, and even then an exception to prove the feasibility of cautionary measures exists. The defense argued that "[t]he addition of the yield sign confirms that it was feasible and demonstrates that the fact that the original signage did not require car traffic to do anything other than be aware." The defense further alleged that preventing the admission of that evidence would harm Pozo-Illas' constitutional right to present a defense.

The circuit court granted the Commonwealth's motion in limine and excluded the evidence under both KRE 407 and KRE 402. The court did not

---

[2] Kentucky Rule of Evidence.

[3] KRE 407.

[4] *Id.*

7

dispute that the public policy behind the existence of KRE 407 was to encourage defendants in civil litigation to implement remedial measures without fear that doing so would be used against them at trial. However, the court reasoned that nothing in the plain language of KRE 407 explicitly prohibited its application in criminal cases. The court therefore ruled that its application was proper, reasoning that the defense was essentially arguing that there was a "defect" in the way the road was marked that day. The court further ruled that evidence of warnings and safety measures that were implemented after the fact were irrelevant to what was in place on the date of the collision.

The defense submitted by avowal a video taken by its investigator demonstrating the added signage and poles. It also submitted testimony from its investigator regarding the video by avowal. This issue is therefore properly preserved for our review. A trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion.[5] "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[6] However, whether KRE 407 is applicable in criminal cases is a matter of first impression for this Court and is an issue of law to be reviewed *de novo*, affording no deference to the trial court's ruling.[7]

---

[5] *See, e.g., Meece v. Commonwealth*, 348 S.W.3d 627, 645 (Ky. 2011).

[6] *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

[7] *See, e.g., Meyers v. Commonwealth*, 381 S.W.3d 280, 283 (Ky. 2012).

Before this Court, Pozo-Illas asserts that KRE 407 should not apply to criminal cases or when the remedial measure is taken by a non-party to the case. Further, he contends that the remedial signage evidence was relevant to prove that no obligation to yield existed on the day of the collision. He argues that a lack of obligation to yield was relevant to prove that he did not act with extreme indifference to the value of human life and therefore did not commit wanton murder.[8] In the alternative, should this Court hold that KRE 407 is applicable, Pozo-Illas contends that the exclusion of the remedial signage violated his right to present a defense. We will address each argument in turn.

### (1) KRE 407 can apply to criminal cases, but it was improperly applied in the case at bar.

"Although denominated 'rules,' the elements of the Kentucky Rules of Evidence were enacted as statutes by the Kentucky General Assembly."[9]

> In construing a statute, it is fundamental that our foremost objective is to determine the legislature's intent in enacting the legislation. To determine legislative intent, we look first to the language of the statute, giving the words their plain and ordinary meaning. Further, we construe a statute only as written, and the intent of the Legislature must be deduced from the language it used, when it is plain and unambiguous[.][10]

---

[8] KRS 507.020(1)(b) ("A person is guilty of murder when . . . Including, but not limited to, the operation of a motor vehicle under circumstances manifesting extreme indifference to human life, he wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person.").

[9] KRE 407, Legislative Research Commission Note (7-1-92). *See also Meyers v. Commonwealth*, 381 S.W.3d 280, 283 (Ky. 2012) ("We interpret [KRE] as we would any statute and turn to traditional tools of statutory construction.").

[10] *Pearce v. Univ. of Louisville, ex rel. Bd. of Trs.*, 448 S.W.3d 746, 749 (Ky. 2014) (internal citations and quotation marks omitted).

Moreover, statutes must be read in conjunction with statutes of similar import and relevance.[11]  That said, KRE 107 provides that

> [t]he Kentucky Rules of Evidence shall take effect on the first day of July, 1992.  **They shall apply to all civil and criminal actions** and proceedings originally brought on for trial upon or after that date and to pretrial motions or matters originally presented to the trial court for decision upon or after that date if a determination of such motions or matters requires an application of evidence principles[.][12]

In turn, KRE 407, states:

> When, after an event, measures are taken which, if taken previously, would have made an injury or harm allegedly caused by the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction.  This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

We agree with the trial court that there is nothing in the plain language of KRE 407 that would prohibit its application in a criminal case.  However, we disagree with the trial court's application of the rule in this particular case.  We leave open the possibility of KRE 407 being properly applied when a criminal defendant who is a party to the case has taken such subsequent measures.  But given that the purpose of the rule is to further the public policy of "encouraging potential defendants to take safety precautions without fear they will be used against them," "the rule's exclusion of evidence of subsequent remedial measures is inapplicable to the actions of persons not party to a

---

[11] *See, e.g., Osborne v. Keeney*, 399 S.W.3d 1, 22 (Ky. 2012).

[12] (Emphasis added).

10

case."[13]  Accordingly, we hold that while KRE 407 may apply in criminal cases, it may only apply in circumstances wherein a party defendant has undertaken the subsequent remedial measures.  However, we still affirm the exclusion of the evidence based on the trial court's additional finding that it was not relevant.

**(2) Evidence of the remedial signage was not relevant, and its exclusion did not harm Pozo-Illas' right to present a defense.**

Pozo-Illas also asserts that evidence of the remedial signage was relevant to demonstrate that he did not have an obligation to yield on the day of the collision, and that proof that he did not have an obligation to yield was relevant to prove that he did not act with extreme indifference to the value of human life.

Relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[14]  We agree with the trial court's ruling that the remedial signage evidence was irrelevant.  The primary issue placed before the jury was Pozo-Illas' mental state on the day of the collision.  Specifically, whether he acted wantonly and with extreme indifference to the value of human life (wanton murder), or whether he only acted wantonly (second-degree manslaughter).  Evidence that

---

[13] *State v. Martin*, 944 A.2d 867, 881 (Vt. 2007).

[14] KRE 401.

11

additional signage was placed at the scene on a later date had no bearing on this determination.

Further, exclusion of that evidence did not harm Pozo-Illas' ability to present his defense. Through cross-examination of a police officer, defense counsel established that the golf cart sign at the scene on the date of the collision was neither a stop sign nor a yield sign. Defense counsel argued the same during its closing argument. Consequently, the jury was presented with evidence that Pozo-Illas did not have an obligation to yield under the signage in place on the date of the collision, which was the purpose for which the defense contends it would have used evidence of the subsequent remedial signage. We accordingly find no error and affirm.

**B. The trial court did not err by failing to instruct the jury in accordance with its order taking judicial notice.**

Pozo-Illas next asserts that the trial court erred by failing to instruct the jury in accordance with its order taking judicial notice that the golf cart warning sign posted at the cart path was not a stop sign or a yield sign.

Prior to trial, defense counsel filed a "Motion to Take Judicial Notice of Facts." In relevant part, counsel asked that the court take judicial notice that:

1. The *Manual on Uniform Traffic Control Devices for Streets and Highways* [MUTCD] is the exclusive legal and factual standard for signs on the public roadways of Kentucky and governs all signs and road markings in this case;

2. That the certain golf cart sign as it appeared in the incident involved in the indictment and which appears in the [MUTCD], is a warning sign to alert road users to locations where unexpected entries into the roadway by golf carts might occur; this sign is not a stop sign or yield sign.

12

In support of its motion, defense counsel tendered 603 KAR[15] 5:050. Section 2 of that Regulation states: "The MUTCD published by the Federal Highway Administration shall be the standard for all traffic control devices installed on any street, highway, bicycle trail, or private road open to public travel in Kentucky." In addition, the defense submitted Section 2C.49 from the MUTCD which provides that the golf cart sign posted at the cart path on the date of the collision "may be used to alert road users to locations where unexpected entries into the roadway by . . . golf carts . . . might occur." Defense counsel accordingly argued in its motion that "the law of Kentucky is, and was at the time of this incident, that the golf cart sign meant but one thing: to alert road users to a location where unexpected entries by golf carts might occur." The trial court entered an order taking judicial notice as requested by the defense, noting that "legally, from the court's review, that is a warning sign."

Later, the defense requested that the trial court instruct the jury in accordance with its order taking judicial notice by tendering a jury instruction that read: "That the certain golf cart sign as it appeared in the incident involved in the indictment is a warning sign to alert road users to locations where unexpected entries into the roadway by golf carts might occur; this sign is not a stop sign or yield sign."[16] As previously noted, during cross-examination

---

[15] Kentucky Administrative Regulation.

[16] The defense withdrew its request to have the jury instructed that the MUTCD is the sole legal authority for traffic signs in Kentucky, as the manual was not

defense counsel elicited testimony from a police officer that the golf cart sign was not a stop or yield sign but was an advisory sign only. The Commonwealth did not attempt to dispute the sign's meaning during re-direct examination of that witness and identified the sign as a "golf cart warning sign" in its closing arguments. The trial court declined to include the defense's requested instruction regarding the legal meaning of the golf cart sign.[17] The court reasoned that evidence was entered at trial regarding the sign's legal meaning, and that it was unaware of any case law or model jury instruction that would allow a jury in a criminal trial to be instructed on the legal meaning of a road sign.

This Court reviews a trial court's refusal to include a jury instruction for abuse of discretion.[18] We may therefore only reverse if the trial court's ruling was "was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[19]

Pozo-Illas argues to this Court that the trial court's failure to instruct the jury in accordance with its order taking judicial notice was reversible error because it substantially prejudiced defendant in that it was crucial to his defense that he acted negligently rather than wantonly. He further asserts that

---

discussed or used to cross-examine any of the Commonwealth's witnesses during the trial.

[17] This issue is therefore properly preserved for our review. Kentucky Rule of Criminal Procedure (RCr) 9.54(2).

[18] *Sargent v. Shaffer*, 467 S.W.3d 198, 203 (Ky. 2015) *overruled on other grounds by Univ. Med. Cntr., Inc. v. Shwab*, 628 S.W.3d 112 (Ky. 2021).

[19] *English*, 993 S.W.2d at 945.

14

the failure was violative of KRE 201, which states in relevant part that "[t]he court shall instruct the jury to accept as conclusive any fact judicially noticed."[20] The Commonwealth, relying on *Clay v. Commonwealth*,[21] argues in response that the legal meaning of a road sign is not an "adjudicative fact" and that the trial court accordingly did not err in failing to include it in the jury instructions. We agree and further hold that Pozo-Illas' right to present a defense was not prejudiced by the omission.

In *Clay*, the defendant was convicted of wanton murder and first-degree sodomy.[22] Part of the Commonwealth's case against the defendant was that DNA testing performed by the Kentucky State Police (KSP) forensic laboratory determined that the defendant's DNA was on the victim's fingertips and jewelry.[23] The defendant attempted to rebut KSP's DNA results by putting on his own DNA expert who testified that KSP had relatively low standards for testing DNA evidence.[24] During the Commonwealth's cross-examination of the defendant's expert, the Commonwealth attempted to impeach the expert's credibility by having him acknowledge that he would not sign off on a DNA report in his own laboratory without first seeing the raw data.[25] The expert responded that he could still examine the veracity of KSP's interpretation

---

[20] KRE 201(g).

[21] 291 S.W.3d 210 (Ky. 2008).

[22] *Id.* at 212.

[23] *Id.*

[24] *Id.* at 217-18.

[25] *Id.* at 218.

15

without raw data because he was critiquing the way KSP analyzes its results once they have been obtained.[26] The Commonwealth then asked a series of questions concerning a defendant's right under Kentucky law to receive any raw data in the Commonwealth's possession.[27] The expert responded each time that he did not know the law of Kentucky.[28] The Commonwealth immediately asked that the court take judicial notice "that that is the law in Kentucky."[29] The trial court promptly took "judicial notice of the fact that that is the law in Kentucky; that defendants do have the opportunity and ability to receive, obtain, and analyze any raw data that is received by the Commonwealth."[30]

On appeal to this Court, the defendant argued that the trial court erred by taking "judicial notice of the law regarding discovery of underlying test data."[31] The *Clay* Court agreed, holding that "the law regarding availability of raw data to a testifying expert was not a fact to be determined, and thus it could not be judicially noticed as it was here."[32] It reasoned:

> KRE 201(a) only allows a court to take "judicial notice of adjudicative facts." Though the Kentucky Rules of Evidence do not define "adjudicative fact," Federal Rule of Evidence 201 is nearly identical to KRE 201 and its drafters provide the following definition: "When a court or an agency finds facts concerning the

---

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.* at 217.

[32] *Id.*

immediate parties—who did what, where, when, how, and with what motive or intent—the court or agency is performing an adjudicative function, and the facts are conveniently called adjudicative facts...." Here, the trial court explicitly said that it was taking judicial notice of what "is the law in Kentucky." It did not take judicial notice of a fact at all. When the Commonwealth asked the question about whether Dr. Acton knew he was entitled to "raw data," it was not trying to prove that the doctor could access the raw data, but rather was attempting to attack his credibility by suggesting that his criticisms of the state lab report weren't valid because he had not seen the underlying data. The doctor responded that he did not need the data itself to criticize the methods used by the lab, which he did know. Whether he was entitled to see the raw data was not a fact at issue in the case, and thus was not an adjudicative fact subject to judicial notice.[33]

Though the *Clay* Court held that the trial court's judicial notice of the law was improper, the alleged error was unpreserved, and the Court declined to hold that the error was manifestly unjust.[34] The Court noted in support that the defendant was able to contest the reliability of the Commonwealth's DNA evidence though his expert, as well as testimony from two of his cellmates that he confessed to the murder.[35]

Similarly, in the case before us, defense counsel explicitly requested in its motion that the trial court take judicial notice that "the law of Kentucky is . . . that the golf cart sign meant but one thing: to alert road users to a location where unexpected entries by golf carts might occur."[36] And, in granting the motion, the trial court stated that "legally, from the court's review, that is a

---

[33] *Id.* at 218 (internal citation omitted).

[34] *Id.* at 220.

[35] *Id.*

[36] Emphasis added.

17

warning sign." But what was required of Pozo-Illas in accordance with the golf cart sign was not a factual determination for the jury to make in this case, as the Commonwealth did not dispute the sign's legal meaning. It was accordingly not an "adjudicative fact" subject to judicial notice, and the trial court's failure to instruct the jury in accordance with its order taking judicial notice was not violative of KRE 201.[37]

Although we hold that the trial court's judicial notice of the golf cart sign's legal meaning was improper, we further hold that the error was harmless and that the trial court did not abuse its discretion by declining to instruct the jury in accordance with its order taking judicial notice. Pozo-Illas' counsel elicited testimony from a police officer as to what the legal meaning of the golf cart sign was, and the Commonwealth did not attempt to dispute that meaning. Moreover, during closing arguments defense counsel argued that the golf cart sign was not a stop sign or a yield sign but was solely an alert sign. Pozo-Illas' ability to present a defense was accordingly not substantially prejudiced.

## C. The trial court did not err by failing to conduct a *Daubert* hearing before denying Pozo-Illas' motion in limine to exclude the testimony of two experts.

---

[37] To be clear, this holding is not meant to suggest that a trial court can never take judicial notice of the law. As the *Clay* Court explained, "a court could still take judicial notice of a law, if that law constituted an adjudicative fact in a particular case. An example of this would be proving the legal drinking age if there was a dispute as to what that age is, or any other time that it might be necessary to prove what the law is as a question of fact." *Id.* at 219-20.

Pozo-Illas' third assertion of error is that the trial court erred by not conducting a *Daubert*[38] hearing before allowing: (1) the admission of Dr. Davis' testimony regarding his retrograde extrapolation of Pozo-Illas' BAC at the time of the collision, and (2) Officer Gillis' testimony regarding the CDR report data.

It will be useful to begin with a brief discussion of the qualifications and conclusions of each expert. Dr. Davis' report began with Dr. Davis' qualifications, which are ample:

> [he is] a physician licensed to practice medicine in Kentucky, Indiana, and North Carolina. [He is] a Professor of Pathology and Laboratory Medicine and Professor in the Department of Toxicology and Cancer Biology in the University of Kentucky College of
>
> Medicine as well as *pro bono* consultant to the Kentucky State Medical Examiner's Office and the Lexington Veterans Administration Medical Center. [He is] Director of the UK Forensic Consultation Service and [is] formerly Associate Chief Medical Examiner of the Commonwealth. [He has] also served as chair of the Forensic Pathology Committee of the College of American Pathologists and on the Forensic Test Committee of the American Board of Pathology. [He is] certified by the American Board of Pathology in Anatomic Pathology, Clinical Pathology, and Forensic Pathology, and [has] testified as an expert in forensic medicine, pathology, and toxicology in numerous State Courts in Kentucky, Ohio, Virginia, West Virginia, Tennessee, Missouri, Indiana, North Carolina, South Carolina, Alabama, Florida, Michigan, Iowa, Maryland, New York, New Jersey, Colorado, and California, as well as in United States Federal Court and the Republic of Singapore.

In coming to his final opinion, Dr. Davis relied upon Pozo-Illas' arrest citation, the uniform traffic collision report; the LMPD[39] arrest report; multiple LMPD videos; the Intoxilyzer report; and the results of both blood draw BAC tests.

---

[38] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

[39] Louisville Metro Police Department.

Dr. Davis' report then explained that most non-heavy drinkers metabolize alcohol at a rate of (0.015 - 0.02 g/100mL/hr[40]). Pozo-Illas' first blood draw showed a BAC of (0.161 g/100mL). The second blood draw taken one hour later showed a BAC of (0.141 g/100mL). Dr. Davis opined that this put Pozo-Illas' within the average person's elimination rate at (0.02 g/100mL/hr).[41] He then multiplied Pozo-Illas' elimination rate by the time between the collision and the first blood draw, two hours and thirteen minutes (2.2 hours):

$$0.02 \text{ g/100mL/hr} \times 2.2 \text{ hr} = 0.044 \text{ g/100mL}.$$

He then added that result to Pozo-Illas' BAC at the time of the first blood draw. However, because the lab results from the first blood draw provide that the test has a margin of error of (+/- 0.010 g/100mL), Dr. Davis gave Pozo-Illas "the benefit of the doubt" and started from the presumption that Pozo-Illas' BAC was (0.151 g/100mL)[42] at the time of the first blood draw for the purposes of his final calculation:

$$0.044 \text{ g/100mL} + 0.151 \text{ g/100mL} = 0.195 \text{ g/100mL}$$

In order to use the elimination rate of 0.02g/100mL/hr, Dr. Davis further assumed for the purposes of the equation that Pozo-Illas had taken his last drink about forty-five minutes or more before the collision.

---

[40] Grams of alcohol per 100mL of blood per hour.

[41] (0.161 g/100mL – 0.141 g/100mL = 0.02 g/100mL).

[42] (0.161 g/100mL – 0.010 g/100mL = 0.151 g/100mL).

20

Officer Gillis' report provides that he took a "Crash Data Retrieval Technician" online course administered by the Institute of Police Technology and Management, as well as an in-person training course in "Event Data Recorder Use in Traffic Crash Reconstruction." The report states that he reviewed, in relevant part, a CDR report captured by retired Officer Don Hargadon. In relevant part, the CDR report includes a graphical representation of the collision that was created by the CDR unit in the Mustang. The CDR unit is essentially the vehicle's "black box" which recorded the vehicle's speed, anti-lock braking system, the pressure applied to accelerator pedal, revolutions per minute, and brake switch. The report states that once the vehicle's airbags deployed, all the data was "locked" into place.

The graph provided in relevant part that it covered "20 seconds prior to the collision and 5 seconds after the collision." Then it states that between twenty seconds before the collision to 1.8 seconds before the collision, the vehicle's speed fluctuated between 54 mph to 60 mph and back to 53 mph. At the point of impact, the CDR recorded that the vehicle's speed was 29 mph. The graph depicts that the brakes were applied between 1.4 seconds before to 0.2 seconds before impact.

Both Dr. Davis and Officer Gillis' testimony at trial was consistent with their respective reports, and each expert was thoroughly cross-examined by defense counsel.

Prior to trial, defense counsel filed a motion to hold a *Daubert* hearing regarding the admissibility of the foregoing expert testimony. Counsel's

21

complaint against Dr. Davis' conclusion regarding Pozo-Illas' BAC at the time of the collision was that the retrograde extrapolation equation used assumed a constant alcohol elimination rate of 0.02 g/100 mL/hr. Counsel argued that "[w]hile the undersigned is not a scientist, it appears that this specific question about the constancy of the elimination rate is open." As for Officer Gillis' report, the defense argued that "the report is little more than the conclusions of a machine," and that there was no way to determine the accuracy of the CDR report. The defense offered no evidence to rebut the experts' respective reports, but merely requested a *Daubert* hearing based on the defense's conclusory statements that their conclusions were unreliable.

The trial court denied Pozo-Illas' request for a *Daubert* hearing for either of the expert witnesses' testimony. The court noted that the defense had received curriculum vitae for both experts, as well as their reports which provided the materials and facts upon which they based their conclusions. The court found that Dr. Davis is a medical doctor, clinical pathologist, and forensic pathologist. And, regarding Officer Gillis' proffered evidence, that "[c]omputer data downloads from motor vehicles have been used for many years." The court found that "both experts have the requisite knowledge, skill, and experience to testify as to the subject matter in their individual reports," that the court "[believed] their testimony will assist the trier of fact in understanding the evidence in this case," and that it "[did] not find sufficient information that either expert [relied] on faulty science or unreliable methods in reaching their conclusions."

22

This Court reviews a trial court's denial of a request for a *Daubert* hearing for abuse of discretion.[43]  A trial court abuses its discretion if its refusal to hold a *Daubert* hearing was "was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[44]  We hold that the trial court did not abuse its discretion by denying the defense's request for *Daubert* hearings on the expert testimony at issue, and that *Florence v. Commonwealth*,[45] is dispositive.

In *Florence*, the defendant was convicted of one count of criminal possession of a forged instrument and two counts of theft by deception over $300.[46]  Prior to trial, the defendant objected to any testimony from the Commonwealth's proposed handwriting expert regarding the science of handwriting analysis without first having a *Daubert* hearing, and the trial court overruled the objection.[47]  On appeal, the defendant argued "that failure of the trial court to hold a *Daubert* hearing to determine the admissibility of the proposed expert testimony regarding handwriting analysis was an abuse of discretion."[48]  The *Florence* Court disagreed.  The Court began by noting that

> [i]n *Johnson v. Commonwealth*,[49] we clarified when a *Daubert* hearing is required.  This Court followed the [Eighth] Circuit

---

[43] *See, e.g., Robbins v. Commonwealth*, 336 S.W.3d 60, 65 (Ky. 2011).

[44] *English*, 993 S.W.2d at 945.

[45] 120 S.W.3d 699 (Ky. 2003).

[46] *Id.* at 700.

[47] *Id.* at 701.

[48] *Id.*

[49] 12 S.W.3d 258 (Ky. 1999).

decision in *United States v. Martinez*[50] where "it was held that once an appropriate appellate court holds that the *Daubert* test of reliability is satisfied, lower courts can take judicial notice of reliability and validity of the scientific method, technique or theory at issue." In *Johnson*, we held that microscopic examination of hair has sufficiently met the scientific reliability standard and that a *Daubert* hearing was no longer required. This Court identified other types of scientific evidence that had been recognized as reliable (breath testing for determination of blood alcohol content, HLA blood typing for paternity determination, fiber analysis, ballistics analysis, and fingerprint analysis), and "[o]n the basis of those decisions, trial judges in Kentucky can take judicial notice that those methods or techniques have achieved the status of scientific reliability."[51]

The Court then noted that there were no Kentucky cases directly holding that handwriting analysis evidence is scientifically reliable.[52] However, the Court found it significant that in at least two cases, *Marcum v. Gallup*[53] and *Jones v. Sutton*,[54] "the lower courts allowed such expert testimony and were affirmed on appeal. In those cases, it seems to have been assumed that the testimony was admissible." Accordingly, the Court held, "the state of the law with respect to handwriting analysis is similar to *Johnson v. Commonwealth, supra,* wherein various fields of scientific inquiry were recognized to have achieved acceptance in Kentucky law, and are thus acceptable for judicial notice."[55] Further, the

---

[50] 3 F.3d 1191 (8th Cir. 1993).

[51] *Florence,* 120 S.W.3d at 702.

[52] *Id.* at 702-03.

[53] 237 S.W.2d 862 (Ky. 1951).

[54] 255 S.W.2d 658 (Ky. 1953).

[55] *Florence,* 120 S.W.3d at 703.

Court held that the defense did not satisfy its burden to compel a *Daubert*

hearing, reasoning that under *Johnson*

> there is a burden shift from the party offering expert testimony to the party opposing the testimony. The opposing party, when it so requests, has a right to present evidence that the scientific evidence at issue is not or is no longer scientifically reliable. In the present case, Appellant did not challenge the reliability of the expert handwriting analysis with evidence to the contrary. Rather he sought only a *Daubert* hearing, and under *Johnson v. Commonwealth* and relying on the general acceptance of handwriting analysis as demonstrated by *Marcum v. Gallup* and *Jones v. Sutton,* a preliminary hearing was not required without a proffer of evidence challenging the reliability of the discipline at issue.[56]

Unlike in *Florence*, this Court has made a definitive statement that while

"extrapolation evidence is not *required* for the Commonwealth to make a prima

facie case of a violation of KRS 189A.010(1)(a)," nothing "precludes the

Commonwealth, or the defendant, from using extrapolation evidence to assist

the trier of fact in its determinations."[57] And, at any rate, retrograde

extrapolation has been used in previous criminal cases.[58] And, while there has

been no definitive statement from this Court regarding the use of CDR reports,

---

[56] *Id.*

[57] *Love v. Commonwealth,* 55 S.W.3d 816, 820 (Ky. 2001). In addition, we note that this is not a situation like *Thomas v. Commonwealth,* 170 S.W.3d 343 (Ky. 2005), wherein the expert was asked in front of the jury to assume the defendant had a history of alcohol abuse when there was no evidence to that the defendant had a history of alcohol abuse. *Id.* at 352. Under those circumstances, we held that "the unsubstantiated 'hypothetical fact' could not be used to support [the expert's] retrograde extrapolation, [as] it served no purpose other than to insinuate that Appellant was a person of bad character in contravention of KRE 404(a)(1)." *Id.*

[58] *See, e.g., Cook v. Commonwealth,* 129 S.W.3d 351, 356 (Ky. 2004) ("The Commonwealth's expert, Dr. Greg Davis, estimated by back-extrapolation that Appellant's blood alcohol concentration at the time of the collision would have been between 0.16 and 0.185 grams per 100 milliliters.").

evidence of that kind has been used in very recent cases without objection from this Court in *Haney v. Commonwealth*,[59] and *Welsh v. Commonwealth*.[60] Finally, as in *Florence*, Pozo-Illas did not "did not challenge the reliability of the expert [retrograde extrapolation or CDR data] with evidence to the contrary,"[61] and instead sought only a *Daubert* hearing.

Based on the foregoing, we cannot hold that the trial court's decision to decline a *Daubert* hearing on the retrograde extrapolation and the CDR data was an abuse of discretion.

## D. The trial court did not err by declining to instruct the jury on reckless homicide.

Pozo-Illas' final argument is that the trial court erred by failing to instruct the jury on reckless homicide.

Pozo-Illas included a reckless homicide instruction in his tendered jury instructions.[62] After discussion, the trial court declined to instruct the jury on reckless homicide, and instead instructed the jury on wanton murder and second-degree manslaughter, both of which require that a defendant acted wantonly. The trial court acknowledged that it was a "close call" solely because reckless homicide is a lesser-included offense to wanton murder and second-degree manslaughter, and it was the court's general practice to instruct its juries on lesser-included offenses. However, the court reasoned that reckless

---

[59] 653 S.W.3d 559, 562 (Ky. 2022).

[60] 641 S.W.3d 132, 135 (Ky. 2022).

[61] *Florence*, 120 S.W.3d at 703.

[62] This error is therefore properly preserved for our review. RCr 9.54(2).

26

homicide is an offense that would require the jury to find that Pozo-Illas acted recklessly, i.e., that he failed to perceive the substantial and unjustifiable risk that his conduct created.[63] The court found that an individual would essentially have to be completely shut off from the outside world to not be aware of deaths caused by drunk driving and deaths caused by speeding. And there was no evidence of record that Pozo-Illas was unaware of the inherent risks of driving while under the influence of alcohol and speeding.

When a defendant argues on appeal that a trial court failed to give a jury instruction required by the evidence presented at trial, this Court reviews the alleged error for abuse of discretion.[64] A trial court abuses its discretion if its decision "was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[65] Additionally, while it is the duty of the trial court to prepare and give instructions on the whole law of the case,[66] a lesser-included offense instruction is not proper simply because a defendant requests it.[67] "[A]n instruction on a lesser included offense is required only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that the defendant is guilty of the lesser offense."[68]

---

[63] KRS 201.020(4).

[64] *Sargent*, 467 S.W.3d at 203.

[65] *English*, 993 S.W.2d at 945.

[66] *Rogers v. Commonwealth*, 86 S.W.3d 29, 43 (Ky. 2002).

[67] *Swan v. Commonwealth*, 384 S.W.3d 77, 99 (Ky. 2012).

[68] *Id.*

As noted by the trial court, for a reckless homicide instruction to be part of the jury instructions as a lesser included offense in this case, the evidence would have to be such that a reasonable juror could find Pozo-Illas guilty of reckless homicide beyond a reasonable doubt while entertaining reasonable doubt as to the defendant's guilt as to wanton murder or second-degree manslaughter.

The primary difference between wanton murder and second-degree manslaughter and reckless homicide is the mental state required to prove them: wanton murder requires that a defendant acted wantonly and with extreme indifference to human life, second-degree manslaughter requires that a defendant acted wantonly, and reckless homicide requires that a defendant acted recklessly. "A person acts wantonly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists."[69] In contrast, "[a] person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists."[70] Accordingly, in this case, the jury would have to believe beyond a reasonable doubt that Pozo-Illas failed to perceive the substantial and unjustifiable risk of death that

[69] KRS 201.020(3).
[70] KRS 201.020(4).

28

his conduct created while having reasonable doubt that he was aware of that risk and consciously disregarded it.

The evidence at trial showed that Pozo-Illas was speeding and driving while intoxicated through a public park on a sunny Sunday afternoon. While driving through the park he drove past, and disregarded, a twenty-five miles per hour speed limit sign and a pedestrian cross walk. While climbing the blind hill leading to the cart path, he passed over rumble strips placed in the middle of his driving lane, which are a universal indicator to motorists to slow down and be aware that there may be changes ahead that may not be anticipated by an inattentive driver. Furthermore, Pozo-Illas stated during his initial interaction with police that he knew there was a golf course in the area where the collision occurred. Pozo-Illas did not testify on his own behalf that he did not know the inherent risk of death concomitant with drinking and driving and speeding, nor was there any other evidence presented by the defense to that effect.

Based on the foregoing, we hold that the trial court did not abuse its discretion in finding that no reasonable juror could have found beyond a reasonable doubt that Pozo-Illas acted recklessly, while having reasonable doubt that he acted wantonly. It therefore did not err by declining to instruct the jury on reckless homicide.

### III.   CONCLUSION

Based on the foregoing, we affirm.

29

VanMeter, C.J.; Conley, Keller, Lambert, Nickell, and Thompson, JJ.; sitting. VanMeter, C.J.; Conley, Keller, and Lambert, JJ.; concur. Thompson, J., concurs in result only. Bisig, J., not sitting.

COUNSEL FOR APPELLANT:

Jennifer Elizabeth Hubbard
Louisville Metro Public Defender's Office

Jazmin Paige Smith
Louisville Metro Public Defender's Office


COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Mark Daniel Barry
Assistant Attorney General