Ondra Leon CLAY, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2007–SC–000377–MR.

Supreme Court of Kentucky.

Dec. 18, 2008.

As Modified on Denial of Rehearing
Aug. 27, 2009.

Susan Jackson Balliet, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, James Coleman Shackelford, Assistant Attorney General, Office of Criminal Appeals, Attorney General's Office, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice NOBLE.

Appellant Ondra Leon Clay was convicted of wanton murder and first-degree sodomy, and was sentenced to life without parole for twenty-five years on the murder and twenty years on the sodomy, to run concurrently. On appeal, Appellant raises a *Batson* challenge, a failure to grant a defense motion to strike a juror for cause, a failure to properly qualify expert testimony, and an invalid use of judicial notice. Because these issues were either not objected to or were improperly objected to and do not rise to the level of palpable error or are without merit, Appellant's conviction is affirmed.

## I. Background

E. S.'s body was found in her Lexington apartment on May 7, 2005. The medical examiner, Dr. John Hunsaker III, found the cause of death to be suffocation by strangulation. The marks on the victim's neck were indicative of both ligature strangulation (by a rope, cord, or necklace) and manual strangulation (by the hands), but Dr. Hunsaker thought that manual strangulation was the most likely cause of death. There were also marks from injuries to the victim's head and there was some damage to the victim's anus. No semen was found on or in the victim, though semen from someone else was found inside the toilet at her apartment. Though neither Appellant's hair nor his fingerprints were found at the scene, his DNA was found on the victim's necklace and her fingertips.

Appellant did not testify at trial. Instead, a recording of his phone call with the homicide detective was played multiple times, and it served as his entire statement before the jury about what happened that night. In the phone call, Appellant admitted he had known the victim for four or five years. He claimed that on the night of the murder she bought him a treat at an ice cream truck about 8 p.m., and that she rubbed his bald head. One witness, Barry

Hall, testified at the preliminary hearing that he saw the Appellant and the victim at the ice cream truck and he saw her rub her fingers over his bald head, calling it a "crystal ball." However, at trial two years later he testified that he had been confused at the preliminary hearing and that he did not see physical contact between them.

Appellant presented an expert, Dr. Ronald Acton, who testified that the Kentucky State Police (KSP) crime lab had relatively low standards for analyzing DNA evidence. Basically, Dr. Acton supported the defense's theory that Appellant's DNA could have been on the victim's hands from earlier in the evening and later secondarily transferred to her necklace. Dr. Acton testified that the "mix" of DNA found on the victim's necklace and fingertips could actually be partly from an entirely different person, and thus the KSP crime lab's conclusions were overly simplified. This contention was significantly undercut when the trial court took judicial notice that Dr. Acton could have had access to the "raw data" even though he did not take advantage of this option. This, however, was not the sole basis of the Commonwealth's case. Two fellow inmates also testified that while in custody Appellant confessed to them that the victim had consented to sexual intercourse with him, and that he had killed her accidentally while trying to keep her quiet during sex.

Alter a jury trial, Appellant was convicted and sentenced to a life sentence without parole for twenty-five years. He appeals to this Court as a matter of right. Ky. Const. § 110(2)(b).

## II. Analysis

### A. *Batson* Challenge

Appellant's first claim of error is that the Commonwealth made a race-based peremptory strike of one African–American juror, Juror 3487, leaving an all-white jury in a case where Appellant is African–American, in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and its progeny. Specifically, Appellant argues that the answers given by the African–American juror were substantially similar to those of several white jurors who were not struck by the Commonwealth, which is sufficient to establish a *Batson* violation under *Snyder v. Louisiana*, 552 U.S. 472, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008), and *Miller–El v. Dretke*, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005).

During individual voir dire, the trial court initially asked Juror 3487 some broad questions, followed by the Commonwealth, and finally by the defense. Both the trial court and the Commonwealth asked questions concerning the penalty phase and whether Juror 3487 could apply mitigating and aggravating factors. The defendant then asked Juror 3487 hypothetically, "[If you were] on a jury on a case and you and your fellow jurors had decided to find a defendant guilty of murder, with an aggravating circumstance, such as has been explained to you today, no matter what the facts of that case were, would you still be interested in hearing something about the defendant's life?" Juror 3487 responded that she would. The defense attorney then asked Juror 3487, "Do you think it would be important enough to perhaps, I mean, could it *possibly change* your opinion about what a recommended *verdict* should be? Do you think it's that important?" (Emphasis added.) Juror 3487 responded, "Yes."

Here, the Commonwealth concedes that the other major topic discussed during the individual voir dire of Juror 3487, specifically her position on the death penalty, was not the reason for peremptorily strik-

ing her. Thus, the sole reason the Commonwealth gave for striking Juror 3487 was that her mitigation statements caused it to believe that she would be less likely to render an initial verdict of guilty, rather than affecting a mitigated sentence only at the penalty stage.

The U.S. Supreme Court has approved of the Ninth Circuit Court of Appeals' conclusion in *United States v. Vasquez–Lopez*, 22 F.3d 900, 902 (9th Cir. 1994), that "the Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Snyder*, 128 S.Ct. at 1208. Under *Batson*, possible race-based peremptory challenges by the prosecution are addressed under a three-step test, which has been described as follows:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Id.* at 1207 (quoting *Miller–El v. Dretke*, 545 U.S. at 277, 125 S.Ct. 2317 (Thomas, J., dissenting)) (internal quotation marks omitted). In this case, when defense counsel realized the jury was entirely white and questioned the strikes, the Commonwealth immediately began discussing Juror 3487 since it had struck her.[1] Therefore, under *Batson*, the Commonwealth waived the first step of the *Batson* inquiry and moved immediately to step two,[2] the offer of a race-neutral basis.

Since the crux of the Commonwealth's race-neutral argument for striking Juror 3487 was that it thought she was talking about the guilt phase and not a later penalty recommendation, the prosecutor explained, "[Juror 3487] stated when talking about mitigation evidence, mitigation evidence could change her mind about what a verdict should be. So, we took that about she thinks whether you're guilty or not; not as just opposed to mitigation. I felt this was a very strong statement." Additionally, Juror 3487 admitted this was enough to "possibly change [her] opinion about what a recommended verdict should be." Further, on appeal, the Commonwealth elaborated that Juror 3487's answer was the *only* answer which it could interpret to mean mitigation evidence could actually change her verdict in the guilt phase.

Because no mitigation evidence would be offered until there had been a finding of guilt, the Commonwealth was mistaken in its belief that the juror was saying that mitigation evidence would affect a finding of guilt. However, a mere mistake by the Commonwealth about what Juror 3487's statements meant does not require this Court to conclude that the trial court erred in finding this to be a race-neutral reason, especially since the trial court knew the Commonwealth did not strike three other African–American jurors. "[A] trial court's denial of a *Batson* challenge will not be reversed unless clearly erroneous." *Chestnut v. Commonwealth*, 250 S.W.3d 288, 302 (Ky.2008);

1. The trial court noted that one African–American juror had been struck by the defense, and two others simply did not make the random draw.

2. The trial court did not have to determine step one of the *Batson* inquiry—whether there

was a *prima facie* case of discrimination—because the prosecutor offered a racially neutral reason for the strike without prompting. *Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

*Hernandez,* 500 U.S. at 369, 111 S.Ct. 1859; *Washington v. Commonwealth,* 34 S.W.3d 376, 380 (Ky.2000). This Court cannot say that the trial court was clearly erroneous in its finding that the Commonwealth had stated a racially neutral reason for striking Juror 3487.

■ After the Commonwealth offered its race-neutral explanation, the *Batson* challenge then moved to step three where Appellant needed to produce evidence of intentional discrimination. *Gray v. Commonwealth,* 203 S.W.3d 679, 690 (Ky.2006); *see also Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) ("[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."); *Commonwealth v. Coker,* 241 S.W.3d 305, 309 (Ky.2007); *Thomas v. Commonwealth,* 153 S.W.3d 772, 777 (Ky. 2004). Appellant, however, only objected that there were no longer any African–American jurors remaining. He did not attempt to compare juror responses to show evidence of discrimination, as allowed under *Miller–El* and *Snyder,* or offer any other example of purposeful discriminatory behavior by the Commonwealth. Therefore, this Court is once again "not persuaded that the Appellant met his subsequent burden to provide further evidence on which the trial court could determine the Commonwealth's peremptory strike to be discriminatory." *Gray,* 203 S.W.3d at 691.

■ Even though Appellant did not attempt to make these juror comparisons to the trial court, he now claims on appeal that there were four white jurors who gave similar answer to Juror 3487, but who were not peremptorily struck by the Commonwealth. The United States Supreme Court has warned appellate courts that "a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial." *Snyder,* 128 S.Ct. at 1207. However, in *Snyder, supra,* the Supreme Court nonetheless engaged in such juror comparisons because the jurors' responses, or "shared characteristics," had been thoroughly explored and made part of the record by the trial court. Here, although the better practice would have been for Clay to present the trial court with proof of the Commonwealth's differing treatment of Juror 3487 and the white jurors, because the record is fully developed regarding the Commonwealth's questions about mitigation evidence, this Court can compare the responses given by Juror 3487 and the four white jurors who were not struck for cause.

Having reviewed the responses of the white jurors, however, this Court is not convinced that the Commonwealth's race-neutral reason it provided for striking Juror 3487 was a pretext or that it was based on racial discrimination. Although the four white jurors stated that they would want to hear all the mitigation evidence before deciding on a penalty, none indicated that mitigation evidence would change their opinion about what the verdict should be. Further, the white jurors' responses indicated that they were discussing how mitigation evidence would affect the penalty phase and not the guilt phase. In addition, the trial court made this ruling knowing that the Commonwealth had not moved to strike the three remaining African–American jurors. Therefore, the trial court did not abuse its discretion in accepting the Commonwealth's explanation for striking Juror 3487 and in concluding that the Commonwealth did not act with a discriminatory intent.

**B. Failure to Strike Juror for Cause**

■ Appellant's second claim of error is the trial court's failure to strike Juror 3049 for cause. Juror 3049 was a secretary in

the Fayette County Commonwealth's Attorney's Office from 1974 to 1981 under the former Commonwealth Attorney, and she served as a witness in a case prosecuted by the current Fayette County Commonwealth's Attorney when he was appointed as an outside special prosecutor (before he became the Commonwealth's Attorney). She also retained a friendship with a member of the office's administrative staff that still worked there. Appellant argues that even though this juror said she could be fair, she should have been struck for cause because of her "close relationship" with the Fayette County prosecutor's office. Juror 3049, however, did not have a "close relationship" with the office or with the current Commonwealth's Attorney at the time of this trial.

■ "The decision whether to excuse a juror for bias lies within the sound discretion of the trial court." *Cook v. Commonwealth,* 129 S.W.3d 351, 357 (Ky.2004). This Court reviews a trial court's determination regarding the exclusion of a juror for cause for an abuse of discretion. *Fugett v. Commonwealth,* 250 S.W.3d 604, 613 (Ky.2008). Also, "the decision to exclude a juror for cause is based on the totality of the circumstances, not in response to any one question." *Id.* Specifically, "[t]he test for determining whether a juror should be stricken for cause is 'whether, after having heard all of the evidence, the prospective juror can conform his views to the requirements of the law and render a fair and impartial verdict.'" *Thompson v. Commonwealth,* 147 S.W.3d 22, 51 (Ky.2004) (quoting *Mabe v. Commonwealth,* 884 S.W.2d 668, 671 (Ky. 1994)); RCr 9.36(1). "[T]he party alleging bias bears the burden of proving that bias and the resulting prejudice." *Cook,* 129 S.W.3d at 357. Once this is shown, "[t]he court must weigh the probability of bias or prejudice based on the entirety of the ju-

ror's responses and demeanor." *Shane v. Commonwealth,* 243 S.W.3d 336, 338 (Ky. 2007). Here, the Appellant did not prove bias in the first instance, much less prejudice resulting from bias.

Appellant argues Juror 3049's bias should be implied because of her previous employment three decades ago, her serving as a witness for the current Fayette County Commonwealth's Attorney (who did not try this case) before he was elected to the position, and her continuing friendship with an administrative staff member in the current Commonwealth's Attorney's Office. These connections, however, are far too tenuous to constitute the "close relationship" required to presume bias or prejudice. *Montgomery v. Commonwealth,* 819 S.W.2d 713 (Ky.1991); *see also Marsch v. Commonwealth,* 743 S.W.2d 830, 833 (Ky.1987) (close relationship existed where two potential jurors were married to victim's second and third cousins, visited funeral home to express condolences to victim's family, and one juror had known victim since he was a teenager and worked with him in church). Since a close relationship was not established, and Juror 3049 testified that she could be fair to both sides, under the totality of the circumstances there is nothing in the record to indicate that she would be biased or prejudiced against Appellant. The trial court's decision not to strike Juror 3049 was not an abuse of discretion.

### C. Expert Testimony

■ Appellant's third claim of error is the testimony of Sexual Assault Nurse Examiner (SANE) program manager Anita Capillo regarding the pre-death behavior of strangulation victims. Capillo testified that because they try to free their necks in order to get a breath, DNA can be expected to be found on victims' fingertips from scratching the hands that are

strangling them. On appeal, Appellant argues that the trial court should have conducted a *Daubert/Kumho Tire* hearing to determine whether Capillo was qualified to be offering such opinions. However, even though defense counsel did object at trial, it was not an objection to the failure to qualify Capillo as an expert, and thus it was the wrong objection. *See Mondie v. Commonwealth,* 158 S.W.3d 203, 212 (Ky. 2005) (error unpreserved where defense counsel objected to witness's testimony as that of a lay witness, but did not object to failure to qualify witness as an expert and did not request a *Daubert* hearing); *Love v. Commonwealth,* 55 S.W.3d 816, 822 (Ky. 2001) (issue of failure to conduct *Daubert* hearing unpreserved where Appellant's objection was premised on relevancy under KRE 401 and not on scientific reliability under KRE 702). Unpreserved errors must be reviewed under the palpable error standard.

Since Appellant did not object and request a hearing under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), Appellant is essentially arguing that the trial court should have conducted a *sua sponte Daubert* hearing. In *Tharp v. Commonwealth,* 40 S.W.3d 356, 367 (Ky. 2000), however, this Court "decline[d] to speculate on the outcome of an unrequested *Daubert* hearing, or to hold that the failure to conduct such a hearing *sua sponte* constitutes palpable error." *Id.* at 368. In this case, in addition to Capillo's testimony, there was DNA evidence and testimony from two fellow inmates who claimed Appellant had confessed. This claim was unpreserved and there was no palpable error.

### D. Judicial Notice

Appellant's fourth claim of error is the trial court's judicial notice of the law re-

garding discovery of underlying test data. Contrary to what counsel for Appellant claims in her brief, the record reveals that no objection was made contemporaneously with the trial court's taking of judicial notice as required by RCr 9.22. Thus, this Court must review this claimed error under the palpable error rule.

■ First, the trial court should not have taken judicial notice of debatable law. KRE 201(a) allows for a court to take "judicial notice of adjudicative facts." "A judicially noticed fact must be one not subject to reasonable dispute" because it concerns a matter "[g]enerally known" or a matter "[c]apable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." KRE 201(b). Only the latter is at issue in this case under what has been deemed the "authoritative sources" test. Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 1.00[3][c], 10 (4th ed., 2003) [hereinafter Lawson, *Kentucky Evidence* ] (quoting Evidence Rules Study Committee, Kentucky Rules of Evidence— Final Draft, p. 16 (Nov.1989)). Under this test, "[a]nything which can be looked up' in an authoritative source is a candidate for this type of judicial notice. The judge should ask two questions: (1) Does the source provide the *precise fact* to be noticed; and (2) Is the source accurate?" *Id.* (quoting Evidence Rules Study Committee, Kentucky Rules of Evidence—Final Draft, p. 16 (Nov.1989)) (emphasis added).

In this case, the trial court took judicial notice of a defendant's right to obtain the "raw data" used to draw a conclusion by the state lab. However, the law regarding availability of raw data to a testifying expert was not a fact to be determined, and thus it could not be judicially noticed as it was here.

During direct examination, defense expert Dr. Ronald Acton testified about the

methods used at the Kentucky State Police (KSP) crime lab. He discussed the higher standards at his own lab, the possibility of an error regarding the KSP lab's analysis of a "mixed" DNA sample, and the possibility of Appellant's DNA being on the victim's necklace from a secondary transfer after she touched his head earlier in the day.

On cross-examination, the Commonwealth sought to impeach Dr. Acton's credibility by getting him to admit he would not sign off on a DNA report in his own lab if he had not looked at the raw data. The Commonwealth asked him if it was "important to look at the raw data." Dr. Acton responded that he could still examine the "veracity of the [KSP crime lab's] interpretation" without raw data because he was critiquing the way the KSP lab analyzes its results once they've been obtained, not its handling of the DNA.

In a somewhat combative tone, the Commonwealth responded, "You're aware, under the law, that the defense is entitled to get the raw data?" Dr. Acton responded that he was not aware of the laws in Kentucky. The Commonwealth then asked, "You could have all the data you needed, couldn't you?" Dr. Acton once again responded that he was unsure. The Commonwealth continued, "So you could even go look at the data" and "under Kentucky law you could even do your own independent testing if there's any reason to challenge it, couldn't you?" Once again, Dr. Acton responded that he did not know the law in Kentucky. At this point, the Commonwealth asked the trial court to take judicial notice "that that is the law in Kentucky." Immediately, the trial court replied by taking discretionary judicial notice under KRE 201(c): [3] "The court takes

judicial notice of the fact that that is the law in Kentucky; that defendants do have the opportunity and ability to receive, obtain, and analyze any raw data that is received by the Commonwealth."

In so doing, the trial court failed to analyze whether the law it was being asked to give judicial notice to was an "adjudicative fact." KRE 201(a) only allows a court to take "judicial notice of adjudicative facts." Though the Kentucky Rules of Evidence do not define "adjudicative fact," Federal Rule of Evidence 201 is nearly identical to KRE 201 and its drafters provide the following definition: "When a court or an agency finds facts concerning the immediate parties—who did what, where, when, how, and with what motive or intent—the court or agency is performing an adjudicative function, and the facts are conveniently called adjudicative facts...." Lawson, *Kentucky Evidence* § 1.00[2][b], at 6 (quoting Fed. R.Evid. 201, Advisory Committee's Note to Subdivision (a)). Here, the trial court explicitly said that it was taking judicial notice of what "is the law in Kentucky." It did not take judicial notice of a fact at all. When the Commonwealth asked the question about whether Dr. Acton knew he was entitled to "raw data," it was not trying to prove that the doctor could access the raw data, but rather was attempting to attack his credibility by suggesting that his criticisms of the state lab report weren't valid because he had not seen the underlying data. The doctor responded that he did not need the data itself to criticize the *methods* used by the lab, which he did know. Whether he was entitled to see the raw data was not a fact at issue in the case, and thus was not an adjudicative fact subject to judicial notice.

---

**3.** The notice is discretionary because the moving party, the Commonwealth, did not supply the trial court with any necessary information as required for mandatory judicial notice under KRE 201(d).

In addition, there is not an "authoritative source" that discusses a defendant's right to receive raw data. The law regarding raw data is not certain in this case, making it debatable as to when and how Dr. Acton could be given the raw data. As such, the trial court's statement on what Kentucky law is in regard to the availability of raw data can reasonably be questioned, and thus the statement of the trial court is not an authoritative source. Instead, Professor Lawson notes that "[t]he kinds of 'unimpeachable sources' that might be used to support judicial notice under th[e] [authoritative sources] test would include encyclopedias, calendars, maps, medical and historical treatises, almanacs, and public records." *Id.* § 1.00[3][c], at 10. These are sources anyone can look to for a relevant fact. For example, a trial court could take judicial notice that "Father's Day in 1979 was on June 17." *Id.* § 1.00[3][c], at 11 (citing *Allen v. Allen,* 518 F.Supp. 1234, 1235 (E.D.Pa.1981)).[4] Anyone can look at a calendar to determine that this is a certain fact.

Further, since it is debatable whether defendants even have a right to receive, obtain and analyze "raw data" in Kentucky, the danger of taking judicial notice of "the law" is demonstrated. The Commonwealth points to KRE 705, which allows an expert to testify "without prior disclosure of the underlying facts or data," but which allows the expert to "be required to disclose the underlying facts or data on cross-examination." The Commonwealth claims that Appellant, on cross-

examination of Marcie Atkins (a KSP crime lab forensic specialist) the day before Dr. Acton testified, could have asked for the underlying data upon which she based her conclusions, and that therefore Dr. Acton could have reviewed the data. The possibility of obtaining data upon which conclusions are based is not, however, the same as obtaining "raw data." There is not a simple rule regarding "raw data" and the parties rightly dispute its meaning at great length in their briefs.

In addition, RCr 7.24 does not explicitly provide for independent testing.[5] In fact, *Green v. Commonwealth,* 684 S.W.2d 13 (Ky.App.1984), specifically notes that "the right to [independent] testing is *implicit* under RCr 7.24." *Id.* at 16 (emphasis added). As evidenced by the parties' lengthy discussion in their briefs, what exactly constitutes "raw data"—whether it is the way a lab analyzes its results or the DNA sample itself—is subject to dispute, and it is not explicitly mentioned in KRE 705 or RCr 7.24. Therefore, in addition to the subject of this judicial notice not being an adjudicative fact, it was also not precise.

Generally, the Kentucky Rules of Evidence contain no provision for judicial notice of the law. Lawson, *Kentucky Evidence* § 1.00[6] at 22. Previous statutes on judicial notice of the law were repealed upon adoption of the evidence rules, with the Rules' specific emphasis only on "adjudicative facts." Obviously, a court could still take judicial notice of a law, if that law constituted an adjudicative fact in a partic-

---

4. It should be noted that "[t]he [Kentucky] Supreme Court has rendered few decisions under KRE 201." Lawson, *Kentucky Evidence* § 1.00[3][b], at 9 n. 24.

5. RCr 7.24(1)(b) provides, "Upon written request by the defense, the attorney for the Commonwealth shall ... permit the defendant to inspect and copy or photograph any

relevant results or reports of physical or mental examinations, and of scientific tests or experiments made in connection with the particular case, or copies thereof, that are known by the attorney for the Commonwealth to be in the possession, custody or control of the Commonwealth."

ular case. An example of this would be proving the legal drinking age if there was a dispute as to what that age is, or any other time that it might be necessary to prove what the law is as a question of fact. Otherwise, taking judicial notice of "the law" during the course of a trial is tantamount to instructing the jury prior to the close of the evidence.

▪ Nonetheless, though the trial court's taking of judicial notice was improper, Appellant did not object to the trial court. Appellant argues on appeal that since judicial notice was taken immediately, there was no time for an objection. Perhaps there was not enough time to object before judicial notice was taken, but this fact does not affect the contemporaneous objection requirement of RCr 9.22.[6] Appellant still could have—and was required to—object after judicial notice was taken in order to preserve this error for appeal. This Court cautions counsel for Appellant to be certain of the record when claiming that an error is preserved. Because this alleged error was not preserved for appellate review, this Court can reverse only if the error constitutes palpable error under RCr 10.26.

▪ A palpable error is one that "affects the substantial rights of a party" and will result in "manifest injustice" if not considered by the court. *Schoenbachler v. Commonwealth*, 95 S.W.3d 830, 836 (Ky. 2003) (quoting RCr 10.26). Recently this Court clarified that the key emphasis in defining such a palpable error under RCr 10.26 is the concept of "manifest injustice." *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky.2006). "[T]he required showing is

probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Id.* Having reviewed Appellant's argument, the Court concludes that there was no manifest injustice because Appellant was able to present evidence regarding the reliability of the DNA testing through Dr. Acton and there was testimony from two of his cellmates that he had confessed. Thus, the erroneous taking of judicial notice was not "shocking or jurisprudentially intolerable" and it cannot be considered palpable error grounds for reversal. *Id.* at 4.

## III.  Conclusion

In conclusion, Appellant has not pointed to any preserved errors that require reversal. First, Appellant did not carry his burden on his *Batson* claim because defense counsel failed to make a showing of purposeful discrimination at trial; a bare observation that all of the selected jurors were white was insufficient. Second, the trial court did not err in failing to strike another juror for cause because she was too far removed, both temporally and in terms of her remaining contacts, from the Fayette County Commonwealth's Attorney's Office and the Fayette County Commonwealth's Attorney. Third, Appellant did not request a *Daubert* hearing regarding the qualifications of the SANE program director; the objection to speculation was insufficient. Fourth, the trial court's taking judicial notice of the law governing raw data was error, but it was unpreserved and does not constitute palpable error.

---

**6.** Even though RCr 9.22 does not require an objection to be made "if a party has no opportunity to object to a ruling or order at the time it is made," Appellant could have objected after the trial court took judicial notice before the Commonwealth's cross-examina- tion of Dr. Acton continued. KRE 201(e) provides, "A party is entitled to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed. In the absence of prior notification, the request may be made after judicial notice has been taken."

For the foregoing reasons, Appellant's conviction and the judgment of the Fayette Circuit Court are affirmed.

All sitting. All concur.