RENDERED: OCTOBER 10, 2025; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-1146-MR

KENNETH MINTON,
INDIVIDUALLY AND AS
PERSONAL REPRESENTATIVE OF
THE ESTATE OF PHYLLIS J.
MINTON, DECEASED                                             APPELLANT

                        APPEAL FROM GRAYSON CIRCUIT COURT
v.                      HONORABLE BRUCE T. BUTLER, JUDGE
                        ACTION NO. 19-CI-00207

PADUCAH & LOUISVILLE
RAILWAY, INC.                                                APPELLEE

AND

NO. 2023-CA-1148-MR

PADUCAH & LOUISVILLE
RAILWAY, INC.                                               CROSS-APPELLANT

                        CROSS-APPEAL FROM GRAYSON CIRCUIT COURT
v.                      HONORABLE BRUCE T. BUTLER, JUDGE
                        ACTION NO. 19-CI-00207

KENNETH MINTON,
INDIVIDUALLY AND AS
PERSONAL REPRESENTATIVE OF
THE ESTATE OF PHYLLIS J.
MINTON, DECEASED                                              CROSS-APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  COMBS, ECKERLE, AND L. JONES, JUDGES.

JONES, L., JUDGE:  Kenneth Minton, both individually and as personal

representative of the estate of Phyllis J. Minton (collectively the Estate), appeals

from the judgment of the Grayson Circuit Court following a jury verdict in favor of

Paducah & Louisville Railway, Inc. (P&L) stemming from a tragic collision which

resulted in the death of Phyllis Minton (Minton).  P&L has also filed a protective

cross-appeal.  We shall resolve both appeals in this combined Opinion.  We affirm

the trial court's judgment.

The record of this case is voluminous.  Relatedly, the parties' briefs

are extensive and discuss numerous issues.  We have examined the record and

considered the parties' briefs, but we shall discuss only the most pertinent facts,

arguments, and citations to authority.  *Schell v. Young*, 640 S.W.3d 24, 29 n.1 (Ky.

App. 2021).

## I. Factual and Procedural History

In 2018, Minton drove her car to a public railroad crossing. A P&L train was approaching that crossing at the same time. There is no dispute that the train's speed was within legal limits.

The crossing was marked with crossbucks[1] and a yield sign, but there were no other warning devices (such as gates or lights). It is undisputed that the train's main headlamp and "ditch lights"[2] were illuminated and that the train sounded its horn[3] and employed its emergency brakes. Nonetheless, the train struck Minton's vehicle, causing her to suffer fatal injuries.

The Estate filed this action against P&L, the train's engineer, and its conductor. The trial court granted partial summary judgment on some of the Estate's claims, and the parties agreed to dismiss the Estate's claims against the engineer and conductor with prejudice. The case eventually proceeded to a lengthy jury trial on the Estate's remaining claims. The jury returned a verdict in favor of

---

[1] Our Supreme Court has described crossbucks as "[a] sign indicating a railroad crossing, shaped like an 'X,' generally placed immediately before the crossing." *Calhoun v. CSX Transp., Inc.*, 331 S.W.3d 236, 239 n.4 (Ky. 2011).

[2] "Ditch lights are similar to headlights which are placed on either side of the engine to cast light on the sides of the tracks." *Furlough v. Union Pacific R.R. Co.*, 766 So. 2d 751, 755 n.6 (La. Ct. App. 2000).

[3] P&L admits in footnote 9 on page 44 of its main brief that it "did not blow the [train's] horn in the 'pattern' and for the 'duration' required by 49 [Code of Federal Regulations] C.F.R. §222.21." The jury found the failure to sound the train's horn properly was not a substantial factor in causing the collision. Trial Court Record (R.) at 2963.

P&L.  The Estate appealed.  That appeal is Case No. 2023-CA-1146-MR.  P&L

filed a protective cross-appeal, which is Case No. 2023-CA-1148-MR.

## II.  Analysis

### A.  Case No. 2023-CA-1146-MR[4]

### 1.  Judicial Notice

One of the Estate's central arguments in circuit court was that P&L

failed to remove vegetation from its right-of-way, which the Estate alleges

impeded Minton's view of the oncoming train.  The Estate presented an expert to

opine that P&L had violated the industry standard regarding vegetation removal.

On cross-examination, P&L asked the expert to identify a Kentucky statute or

administrative regulation which required a railroad to remove vegetation at

crossings.  The expert did not directly answer P&L's question, and instead testified

generally that a railroad has a duty to exercise reasonable care.  P&L's counsel

repeated the question, after which the Estate objected, asserting the question was

misleading and P&L's counsel was arguing the law with the witness.  The trial

court overruled the objection.[5]

---

[4] We decline P&L's request to revisit a motion panel's decision to deny P&L's motion to dismiss this appeal on timeliness grounds.

[5] Many objections in this case were made in open court where they could be heard by the jury. We remind counsel and the trial court that our Supreme Court has emphasized that objections, responses thereto, and the court's ruling thereon should be made at the bench, outside the jury's hearing.  *See Mayo v. Commonwealth*, 322 S.W.3d 41, 52 n.13 (Ky. 2010).

After asking similar questions and receiving similar responses, P&L's counsel asked the court to take judicial notice that there is no statute or regulation in Kentucky "on the clearance of vegetation at railroad crossings."  The court responded:  "I'll take judicial notice of that."  Video Record (VR), 5/23/2023, at 16:32:42 *et seq*.  The Estate did not object, and P&L's questioning of the witness resumed.  The following morning, the Estate objected to the court having taken judicial notice.

The Estate asserts the court erred by taking judicial notice.  We agree, but conclude the issue is unpreserved and the error is not palpable.

Judicial notice is governed by Kentucky Rule of Evidence (KRE) 201, which provides:

> (a) Scope of rule.  This rule governs only judicial notice of adjudicative facts.
>
> (b) Kinds of facts.  A judicially noticed fact must be one not subject to reasonable dispute in that it is either:
>
>> (1) Generally known within the county from which the jurors are drawn . . .; or
>>
>> (2) Capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.
>
> (c) When discretionary.  A court may take judicial notice, whether requested or not.

(d) When mandatory.  A court shall take judicial notice if requested by a party and supplied with the necessary information.

(e) Opportunity to be heard.  A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed.  In the absence of prior notification, the request may be made after judicial notice has been taken.

(f) Time of taking notice.  Judicial notice may be taken at any stage of the proceeding.

(g) Instructing the jury.  The court shall instruct the jury to accept as conclusive any fact judicially noticed.

Here, the Estate could not have objected prior to the trial court quickly granting P&L's request.  However, the issue is unpreserved because the Estate did not timely object after the court took judicial notice.

The Estate's objection to P&L's question shortly before the court was asked to take judicial notice did not preserve the Estate's objection to the judicial notice issue because the objection had nothing to do with the taking of judicial notice.  Therefore, the issue could only be preserved if the Estate timely objected after the taking of judicial notice.  That did not occur.

Our Supreme Court has applied the contemporaneous objection rule (*see* Kentucky Rule of Civil Procedure (CR) 46) to the taking of judicial notice. *Clay v. Commonwealth*, 291 S.W.3d 210, 220 (Ky. 2008), *as modified on denial of*

*reh'g* (Aug. 27, 2009).[6]  Specifically, our Supreme Court held that "[p]erhaps there was not enough time to object before judicial notice was taken, but this fact does not affect the contemporaneous objection requirement . . . ." *Id.*  The Court noted that the objecting party could have objected "before the Commonwealth's cross-examination of [the witness] continued." *Id.* at n.6.

Here, the Estate did not object before P&L's examination of the witness continued – in fact, the Estate did not object until the following morning. Therefore, the objection was not contemporaneous and so the issue is unpreserved.

Because the issue is unpreserved, the Estate is entitled to relief only if we conclude the taking of judicial notice was a palpable error. *See* CR 61.02 and KRE 103(e).  An error is palpable only if it is "easily perceptible, plain, obvious and readily noticeable.  It should be so egregious that it jumps off the page . . . and cries out for relief." *Simpson v. Commonwealth*, 653 S.W.3d 855, 867-68 (Ky. 2022) (internal quotation marks and citations omitted).

The parties do not assert that the lack of a statutory or administrative regulation requiring a railroad to clear vegetation near a crossing is a matter of common knowledge under KRE 201(b)(1).  Thus, judicial notice here must have been premised upon KRE 202(b)(2), which allows a court to take judicial notice of

---

[6] *Clay* cites Kentucky Rule of Criminal Procedure (RCr) 9.22 for the contemporaneous objection rule, but RCr 9.22 is functionally identical to CR 46.

matters which are "not subject to reasonable dispute" because they are "[c]apable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." As our Supreme Court explained, "[a]nything which can be looked up in an authoritative source is a candidate for this type of judicial notice. The judge should ask two questions: (1) Does the source provide the *precise fact* to be noticed; and (2) Is the source accurate?" *Clay*, 291 S.W.3d at 217 (brackets in *Clay*) (internal quotation marks and citations omitted).

Here, P&L cited to statutes and regulations regarding vegetation maintenance. Our Supreme Court has held that "the Kentucky Rules of Evidence contain no provision for judicial notice of the law." *Clay*, 291 S.W.3d at 219. There are limited exceptions allowing a court to take judicial notice of a law if the law "constituted an adjudicative fact in a particular case. An example of this would be proving the legal drinking age if there was a dispute as to what that age is . . . ." *Id.* at 219-20. However, as a general matter, "taking judicial notice of 'the law' during the course of a trial is tantamount to instructing the jury prior to the close of the evidence." *Id.* at 220.

Here, taking judicial notice of what the law lacks is as improper as taking notice of what the law contains. Indeed, the parties have not cited, nor have we independently located, precedent which allows a court to take judicial notice of

-8-

a negative. In short, we agree with the Estate that the trial court should not have taken judicial notice under these facts.[7]

Nonetheless, we conclude the Estate has not shown the error was so egregious that it rises to the level of being a palpable error. First, the court did not include the judicial notice in the jury instructions, even though KRE 201(g) states that "[t]he court shall instruct the jury to accept as conclusive any fact judicially noticed." Moreover, as the Estate notes, the time between the request for taking judicial notice and the court's agreeing to do so consumed only a few seconds of a multi-day trial, and the judicial notice was not mentioned again.

Finally, the trial court (over P&L's objection) instructed the jury that "[u]nder Kentucky law, it was the duty of P&L to keep its right-of-way at the Crossing from becoming foul with vegetation." R. at p. 2967. Therefore, despite the taking of judicial notice, the jury was nonetheless told that P&L had a duty to keep its right of way from becoming "foul" with vegetation.

In sum, the taking of judicial notice was not a palpable error.

## 2. Other Evidentiary Rulings

The Estate challenges several evidentiary decisions made by the trial court. KRE 103 provides in relevant part as follows:

---

[7] We empathize with P&L's counsel's frustration at the witness's unwillingness to answer the questions, but counsel could have simply asked the court to direct the witness to answer counsel's questions.

(a) Effect of erroneous ruling.  Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected; and

(1) Objection.  If the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; or

(2) Offer of proof.  If the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

If the evidentiary issue was properly preserved, we review the trial court's decision under the deferential abuse of discretion standard.  *See, e.g.*, *Werner Enterprises, Inc. v. Northland Ins. Co.*, 437 S.W.3d 730, 734 (Ky. App. 2014).

### a.  Exclusion of Evidence of Active Warning Devices

The Estate claims it is entitled to a new trial because the trial court prohibited introduction of evidence regarding P&L's failure to install additional warning devices at the crossing.  We disagree.

Paragraph 36(j) of the Estate's complaint alleged P&L was negligent because it "failed to install additional warning devices or warning techniques at the Blackrock Crossing despite the various hazardous conditions at the crossing which made the crossing extra-hazardous[.]"  R. at 49.  In an order granting P&L's motion for partial summary judgment, the trial court held that Kentucky law

-10-

"makes it clear that railroads have no duty to place, determine the need for, or select the type of traffic control devices at grade crossings." R. at 976. Of course, under Kentucky law, "[i]f no duty is owed by the defendant to the plaintiff, there can be no breach thereof, and therefore no actionable negligence." *Ashcraft v. Peoples Liberty Bank & Tr. Co., Inc.*, 724 S.W.2d 228, 229 (Ky. App. 1986). Thus, the court held that the Estate was "prohibited from presenting evidence, argument, comment, or other reference that tends to suggest or imply that P&L was negligent or may be found liable, or that an award of damages may be made" regarding P&L's failure to install additional warning devices. R. at 981.

Shortly before trial the Estate filed what substantively amounts to a motion asking the trial court to reconsider that ruling. The Estate's motion, styled as a "brief," asserted that "evidence concerning various active warnings (flagging, flashing lights, gates) that the railroad could have provided at the Blackrock Drive Crossing are [sic] admissible because Plaintiff has a claim that the Crossing was unusually dangerous." R. at 2881.[8]

The trial court denied the Estate's motion, pertinently holding:

Kentucky has adopted the MUTCD [the federal Manual on Uniform Traffic Control Devices], which places all

---

[8] P&L argues the issue is unpreserved. Though the Estate's pretrial motion at first glance appears to have sufficiently preserved the issue, we need not definitively resolve the preservation matter because the Estate is not entitled to relief even if we were to assume, *arguendo*, that the issue is preserved.

-11-

authority for traffic control devices (like lights and gates) at grade crossing[s] on public agencies and officials, and therefore the law does not permit P&L to install lights and gates . . . . Even if the crossing were extra-hazardous, P&L cannot ameliorate such an issue by installing traffic control devices. Again, Kentucky law does not allow P&L to install or determine the need for traffic control devices. Therefore, Plaintiff's argument that installation of control devices are precautions or warnings the railroad company could have taken has no relevance to this proceeding.

R. at 2945-46 (paragraph breaks, internal quotation marks, and citations omitted).

The Estate argues "the jury should have been permitted to find that, due to the unusually dangerous conditions, the standard of care required of P&L Railway at the Blackrock Crossing could have been met if P&L [had installed] automatic warning devices."[9] Appellant's Brief, at 18.

The General Assembly has imposed two relevant statutory duties upon railroads. First, KRS 277.190(1) requires a train to ring its bell or whistle "at a distance of at least fifty (50) rods from the place where the track crosses upon the

---

[9] Automatic warning devices, as used by the Estate, seem to be synonymous with *active warning devices*, which are defined in 23 C.F.R. § 646.204 as "traffic control devices activated by the approach or presence of a train, such as flashing light signals, automatic gates and similar devices, as well as manually operated devices and crossing watchmen, all of which display to motorists positive warning of the approach or presence of a train." By contrast, *passive warning devices* are "those types of traffic control devices, including signs, markings and other devices, located at or in advance of grade crossings to indicate the presence of a crossing but which do not change aspect upon the approach or presence of a train." *Id.*

same level any highway . . . ."[10]  Second, in pertinent part, KRS 277.160(1) requires railroads to erect "signal boards" – a/k/a crossbucks – "at each public highway where it is crossed by the railroad track at the same level . . . ."  The Estate has not cited additional statutory or administrative regulations requiring a railroad to install additional warning devices at crossings.

However, there are increased common law duties imposed upon a railroad, and a motorist or pedestrian, at an extra-hazardous crossing.  *See, e.g.*, *Louisville & N.R. Co. v. Parks' Adm'r*, 157 S.W. 27, 28 (Ky. 1913).  "An extra-hazardous crossing is one that obscures the view of the traveling public approaching a crossing.  This may consist of cuts, embankments, vegetation or other obstacles that obstruct the view of the traveling public in close proximity to the crossing."  *Wright v. Illinois Cent. Gulf R.R Co.*, 550 S.W.2d 489, 491 (Ky. 1977).

If the crossing is extra-hazardous, which some precedent refers to with alternate terms such as "exceptionally dangerous" or "ultra-hazardous," then:

> the railroad company and the traveler have a mutual and
> reciprocal duty of keeping a lookout to avoid giving or
> receiving injury, and it has been held that where the facts
> justified, it was proper to submit to the jury the question
> whether the railroad, in the exercise of proper care,
> should keep a flagman at the crossing, or adopt some
> other precautions to protect the public.

---

[10] A *rod* is "equal to 16.5 feet . . . ."  *Rod*, BLACK'S LAW DICTIONARY (12th ed. 2024).  Thus, KRS 277.190(1) archaically requires the whistle or horn to be sounded 825 feet from a crossing.

*Piersall's Adm'r v. Chesapeake & O. Ry. Co.*, 203 S.W. 551, 553 (Ky. 1918).

*Accord Parks' Adm'r*, 157 S.W. at 29 ("[I]f, as a matter of fact, the approach to the crossing was obscured by reason of such growth of weeds, briars, brush, etc., as to render the crossing an unusually dangerous one, and this fact was known to the company, it was then a question for the jury to say whether or not, under the circumstances, it was incumbent upon the company to use other and additional means than those provided in the statute to warn the public of its trains' approach.") *and Citizens State Bank v. Seaboard Sys. R.R., Inc.*, 803 S.W.2d 585, 588 (Ky. App. 1991) ("Here, where a crossing may be extra hazardous, we can not [sic] say that the mere ringing of a bell and the presence of automatic signals were sufficient as a matter of law. Given the extra hazardous nature of the crossing, the jury could reasonably conclude that greater safety measures should have, and could have, been taken by Seaboard.").

The question is whether the Estate should have been allowed to introduce evidence of "some other precautions" or "greater safety measures" which a railroad may be obligated to take at an extra-hazardous crossing. However, those additional common law duties might have been eliminated by the adoption in

-14-

Kentucky of the MUTCD, which makes plain that railroads are not responsible for determining the need for, or selecting, warning devices at crossings.[11]

There appears to be a divergence between the common law (which imposes additional duties upon a railroad at extra-hazardous crossings, up to and including the installation of gates or signs) and the MUTCD – which is the positive law of Kentucky by virtue of being adopted in an administrative regulation. The MUTCD places the sole responsibility for assessing the need for, and installing, warning devices at crossings upon the Transportation Cabinet. *See, e.g.*, *Portwood v. Hoskins-Squier*, 689 S.W.3d 728, 734 n.3 (Ky. App. 2024) ("Kentucky has adopted the MUTCD, which requires the Department of Highways to promulgate and adopt a manual of standards for control of traffic devices and the MUTCD, by regulation, is the standard for all traffic control devices installed on any roads throughout the Commonwealth. *The MUTCD provides that traffic control devices*,

_____

[11] KRS 189.337 requires the Department of Highways to adopt a manual governing traffic control devices; the Transportation Cabinet has promulgated 603 Kentucky Administrative Regulation (KAR) 5:050 §2, which adopts the MUTCD as "the standard for all traffic control devices installed on any street, highway, bicycle trail or private road open to public travel in Kentucky." Section 1A.07 of the applicable version of the MUTCD under these facts provided that "[t]he responsibility for the design, placement, operation, maintenance, and uniformity of traffic control devices shall rest with the public agency or the official having jurisdiction" and Section 8A.01 of the pertinent MUTCD provided that "[t]he highway agency or authority with jurisdiction and the regulatory agency with statutory authority, if applicable, jointly determine the need and selection of devices at a grade crossing." Section 1A.13(80) defined *grade crossing* as "the general area where a highway and a railroad . . . cross at the same level, within which are included the tracks, highway, and traffic control devices for traffic traversing that area." *See* https://mutcd.fhwa.dot.gov/pdfs/2009r1r2/mutcd2009r1r2edition.pdf (last visited Aug. 11, 2025).

advertisements, announcements, and other signs or messages *within the highway right-of-way shall be placed only as authorized by a public authority or the official having jurisdiction*, for the purpose of regulating, warning, or guiding traffic.") (emphasis added).

However, we need not definitively resolve this seeming conflict because the jury rejected the Estate's contention that the crossing is extra-hazardous. Instruction 9 directly asked the jury if it found the crossing to be extra-hazardous; to which the jury unanimously answered "no." R. at 2965.

Thus, the questions of what, if any, additional common law duties P&L owed at an extra-hazardous crossing in light of the adoption of the MUTCD in Kentucky, and whether P&L failed to meet any such duties, are purely academic. In other words, the viability of heightened common law duties imposed upon P&L at extra-hazardous crossings is irrelevant since this crossing was specifically found not to be extra-hazardous. We decline to offer an advisory opinion as to whether the trial court erred in excluding evidence about how P&L could satisfy what, under the jury's verdict, are inapplicable duties. *See, e.g.*, *Philpot v. Patton*, 837 S.W.2d 491, 493 (Ky. 1992).

### b. Admissibility of Investigating Officer's Opinions

The Estate challenges the trial court's decision to allow the investigating officer, Sgt. Fred Norder, to testify regarding his report on the

collision. Sgt. Norder testified that Minton's inattention was a contributing factor to the collision and that he had not seen evidence that she had attempted to yield to the train as required by Kentucky law.

We begin by noting that Sgt. Norder's statement that Kentucky law required Minton to yield to the train is correct. At crossings, trains have the right-of-way versus vehicles. *See, e.g.*, KRS 189.560(1)(c) (providing that the "operator of a vehicle shall stop and remain standing at a railroad grade crossing when . . . [a]n approaching train or other on-track equipment is visible and in hazardous proximity"); *Illinois Cent. R.R. Co. v. Arms*, 361 S.W.2d 506, 509 (Ky. 1962) ("In general, the rights and duties of a railroad company and the traveling public in the use of grade crossings are mutual and reciprocal and each must exercise the degree of care commensurate with the danger, but trains have the right of way and all persons on the street or highway shall yield precedence to the trains.").

P&L offered Sgt. Norder as an expert witness. P&L had listed Sgt. Norder as an expert prior to trial, and the expert disclosure stated that he was expected to testify "that Ms. Minton did not attempt to make any crash avoidance maneuver prior to this accident" and that "drivers must yield to trains at the Blackrock Drive Crossing, including and up to stopping if necessary to do so for safety . . . ." R. at 1153. The Estate filed a pretrial motion to exclude Sgt. Norder's lay opinions as to the cause of the collision, but that motion did not

directly challenge his status as an expert witness.[12]  Consequently, we must accept that Sgt. Norder was qualified to be an expert witness.

Boiled to its essence, the Estate's argument is that "the trial court erred in allowing the investigating officer to give his ultimate opinion as to the cause of the collision . . . ."  Appellant's Brief, at 20.  An *ultimate issue* is "[a] not-yet-decided point that is sufficient either in itself or in connection with other points to resolve the entire dispute or lawsuit; esp., an issue that is essential either to a plaintiff's claim or to a defendant's defense."  BLACK'S LAW DICTIONARY (12th ed. 2024) (defining *ultimate issue* within *issue*).

Modern Kentucky precedent generally allows an expert to offer ultimate opinion testimony.  *See, e.g.*, *Werner Enterprises, Inc.*, 437 S.W.3d at 735.  Previously, however, experts were not permitted to do so.  For example, nearly forty years ago we held that a trial court erred "by permitting the investigating state trooper to testify that he listed [a party's] improperly parked vehicle as a contributing factor in the collision on his police report" because that ultimate opinion testimony usurped the jury's prerogative.  *Kennedy v. Hageman*, 704 S.W.2d 656, 659 (Ky. App. 1985).  However, in 1997, our Supreme Court explicitly "depart[ed] from the 'ultimate issue' rule" and instead allowed experts to

---

[12] We reject the Estate's assertion that its challenge to the admissibility of Sgt. Norder's report functions as a challenge to the sergeant's status as an expert.

-18-

provide ultimate issue testimony if the testimony was otherwise admissible. *Stringer v. Commonwealth*, 956 S.W.2d 883, 891 (Ky. 1997). Thus, *Stringer* "establish[ed] that expert opinion [testimony] that meets all of the requirements for admissibility is not objectionable just because it embraces an ultimate issue." 1 Robert G. Lawson, *Kentucky Evidence Law Handbook* § 6.25[3][c] (2024) (internal quotation marks, footnote, and citation omitted).

*Stringer* did not explicitly overrule *Kennedy*. The viability of *Kennedy*'s holding regarding presentation of ultimate issue testimony by experts has not been examined by this Court, or our Supreme Court, since *Stringer* was issued. The question therefore is whether our Supreme Court's abandonment of the prohibition on ultimate issue testimony by experts overruled *sub silentio* our reliance on that doctrine in *Kennedy*. The answer to that question must be yes: *Stringer* was issued after *Kennedy* and explicitly rejected the doctrinal underpinning of *Kennedy*. Consequently, the trial court did not abuse its discretion by allowing Sgt. Norder to offer the challenged ultimate issue testimony. *Werner Enterprises, Inc.*, 437 S.W.3d at 733-35 (allowing a trooper who had not viewed a collision to testify that "following too closely and inattention" were human factors involved in the collision as such testimony "did not invade the province of the jury").

### 3. Jury Instruction Issues

The Estate raises two main challenges to the jury instructions. We examine each challenged instruction in turn.

### a. Standards of Review

A party challenging a jury instruction may preserve the issue for appellate review "by making an objection, either oral or written, before the court instructs the jury, that specifically states the matter to which he objects and the ground or grounds of his objection, or by offering his own proposed instructions which fairly and adequately present his position." *Norton Healthcare, Inc. v. Disselkamp*, 600 S.W.3d 696, 709 (Ky. 2020) (internal quotation marks and citations omitted). *See also* CR 51(3). Our Supreme Court has held that "[w]hen the [alleged] error arises from giving an unwarranted instruction or failing to give a warranted instruction, we review the decision for abuse of discretion" but if "the [alleged] error hinges on whether the text of the instruction accurately presented the applicable legal theory, we review the content of a jury instruction *de novo*." *Commonwealth v. Caudill*, 540 S.W.3d 364, 366-67 (Ky. 2018) (internal quotation marks and citations omitted).

An "erroneous jury instruction may sometimes be an unfortunate, yet ultimately harmless error" but "erroneous instructions to the jury are presumed to be prejudicial" and "an appellee claiming harmless error bears the burden of

showing affirmatively that no prejudice resulted from the error." *Harp v. Commonwealth*, 266 S.W.3d 813, 818 (Ky. 2008) (footnotes, internal quotation marks, and citations omitted). Finally, an unpreserved challenge to a jury instruction is "not entitled to appellate review." *Disselkamp*, 600 S.W.3d at 710.

### b. Duty to Yield Instruction

The Estate challenges instruction 12, which provides in relevant part:

> The Crossing in this case was marked with a yield sign. A Kentucky statute ([Kentucky Revised Statute] KRS 189.330) requires the operator of a vehicle approaching a yield sign to, in obedience to such sign, slow down to a speed reasonable for the existing conditions and, if required for safety to stop, to stop at the point nearest the crossing where the driver has a view of approaching trains before entering the crossing. After slowing and stopping, the driver shall yield the right-of-way to any train in the crossing or approaching on the tracks so closely as to constitute an immediate hazard during the time such driver is moving across or within the crossing.
>
> If you are satisfied from the evidence that Phyllis Minton failed to comply with the requirements of KRS 189.330 in one or more ways and that such failure was a substantial factor in causing the collision, you will answer YES; otherwise, you will answer NO.

R. at 2968. The jury unanimously answered "yes."

The Estate argues the instruction erroneously "placed an unconditional duty on Mrs. Minton to stop at the yield sign before entering the Blackrock Drive Crossing." Appellant's Brief, at 23. We decline to opine

definitively on the instruction because ultimately the jury did not have to answer the question posed therein.

The jury was asked in Instruction 8 if P&L's failure to meet its duty to sound the train's horn properly was a substantial factor in causing the fatal collision. The jury answered "no." The jury also found the crossing was not extra-hazardous. Therefore, the jury was not required to address whether P&L satisfied any purported, additional, common law duties imposed at such crossings. Finally, when asked in Instruction 11 whether P&L "failed to keep its right-of-way at the Crossing from becoming foul with vegetation and that such failure was a substantial factor in causing the collision . . . ," the jury answered "no." R. at 2967. The jury thus absolved P&L from being liable to the Estate under the three remaining theories submitted to it (failure to sound the horn properly, failure to satisfy heightened duties at extra-hazardous crossings, and failure to properly control vegetation in P&L's right-of-way). This means it did not matter whether the jury found Minton had, or had not, met her own duties at the crossing. Thus the Estate could not have prevailed in its claims, regardless of how the jury answered Instruction 12, and any potential error in that instruction is harmless and does not constitute reversible error.

### c. Extra-Hazardous Crossing Instructions

The Estate next challenges the definition of an extra-hazardous crossing included in Instructions 4 and 9. The Estate challenges only the definition used in the instructions, not the decision to define the term. Indeed, the Estate's tendered instructions also proposed a definition for an unusually dangerous crossing. R. at 2889. Consequently, our review is *de novo*. *Caudill*, 540 S.W.3d at 367.

Instructions 4 and 9 each defined an extra-hazardous crossing as:

> a crossing at which a real and substantial obstruction to sight or hearing creates an actual physical inability to see or hear an approaching train for a motorist in close proximity to the crossing who is exercising ordinary care for her own safety. This may consist of cuts, embankments, vegetation or other obstacles that obstruct the view of the traveling public in close proximity to the crossing. There must be an actual physical inability to see or hear, and not merely such human factors as a disinclination to look for a train due to the angle of the intersection, distractions or diversions.

R. at 2959, 2964. The Estate contends the instruction's final sentence misstates the law because human factors play no role in determining whether a crossing is extra-hazardous. Thus, under the Estate's viewpoint, the jury could have determined the crossing was not extra-hazardous if it believed that Minton had been distracted or had not looked for the train before entering the crossing.

-23-

The portion of the definition stating that an extra-hazardous crossing "may consist of cuts, embankments, vegetation or other obstacles that obstruct the view of the traveling public in close proximity to the crossing" is drawn verbatim from *Wright*, 550 S.W.2d at 491. However, the language challenged by the Estate regarding human factors was taken verbatim from *Jewell v. CSX Transportation, Inc.*, 135 F.3d 361, 364 (6th Cir. 1998). That federal court decision pertinently provides:

> The district court was correct in its determination that the test for an extra-hazardous crossing under Kentucky law is whether there is a real and substantial obstruction to sight or hearing. The district court was also correct in its determination that this test requires an actual physical inability to see or hear, and not merely such human factors as a disinclination to look for a train due to the angle of the intersection, distractions or diversions.

*Id. Jewell* has not been cited by a Kentucky appellate court. And, of course, "we are not bound by a federal court's interpretation of state law." *LKS Pizza, Inc. v. Commonwealth ex rel. Rudolph*, 169 S.W.3d 46, 49 (Ky. App. 2005).

We agree with P&L that a driver's actions, or inactions, at a crossing cannot transform an ordinary crossing into an extra-hazardous one. We also agree with the Estate that the converse must be true in that a driver's actions, or inactions, cannot transform an extra-hazardous crossing into an ordinary one. Only a crossing's physical characteristics determine whether it is extra-hazardous.

-24-

Over a century ago Kentucky's then-highest court explained that a crossing may be found to be extra-hazardous (otherwise known as "exceptionally dangerous") "on account of the contour of the surface of the ground or on account of obstructions, which obstruct the view or hearing in an exceptional way, and which renders the usual and statutory signals of the approach of a train [inadequate] for the protection of travelers upon the crossing . . . ." *Piersall's Adm'r*, 203 S.W. at 553. Our Supreme Court utilized the same basic framework in *Wright*, 550 S.W.2d at 491, by stressing that it analyzed whether a crossing was extra-hazardous "from a topographical standpoint." Consequently, the instructional definition of extra-hazardous should have focused solely upon the physical characteristics of the crossing. 2 Cooper & Cetrulo, *Kentucky Jury Instructions* § 25.01(1)(d) (2024) (allowing a jury to find a crossing is extra-hazardous "by reason of its location and surrounding physical conditions").

The instructions did not need to add language stating that human factors cannot, by themselves, cause a crossing to be extra-hazardous. Nonetheless, that is a correct statement of Kentucky law.

We disagree with the Estate that the instructions allowed the jury to find that the crossing was not extra-hazardous simply because of human factors, such as Minton's purported inattention. First, the sentence which the Estate challenges specifically states that "[t]here must be a physical inability to see or

-25-

hear" by an approaching motorist for a crossing to be extra-hazardous. R. at 2964.

Next, though not stressed by the parties, we conclude that the second paragraph of

Instruction 9 sufficiently reinforced and ensured that the jury had to determine

whether the crossing was extra-hazardous solely upon the physical nature of the

crossing. The paragraph in Instruction 9 immediately following the definition of

extra-hazardous states:

> Do you believe from the evidence that *by reason of its location and surrounding physical conditions the Crossing was extra-hazardous*, as defined above, and that the locomotive's lights and the sounding of the locomotive's bell and horn were not enough to provide reasonable warning of the train's approach to travelers on the highways in close proximity to the Crossing exercising ordinary care for their own safety, and that P&L knew or in the exercise of ordinary care should have known it?

R. at 2964 (emphasis added). That paragraph forthrightly informed the jury that it

could only find the crossing to be extra-hazardous "by reason of its location and

surrounding physical conditions . . . ." That is the language in the applicable

model instruction. *See* 2 Cooper & Cetrulo, *Kentucky Jury Instructions* §

25.01(1)(d) (2024). The challenged language in the instructions at hand regarding

human factors was arguably superfluous, but not misleading or a blatantly

incorrect statement of the law, taken in full context.

### 4. Closing Argument

Finally, we reject the Estate's argument that the error in the jury instructions allowed P&L's counsel to assert in closing argument that the crossing was not extra-hazardous because Minton had not exercised ordinary care. While such argument was improper, the errors contained therein were not preserved for our review via a contemporaneous objection, and the Estate has not argued that the closing arguments, standing alone, were so egregiously improper as to require a new trial.

In closing argument, P&L's counsel stated that "if she [Minton] did not exercise ordinary care for her own safety, then, by the definition [of extra-hazardous crossings] you will find in Instruction number 4 and number 9, this crossing was not extra-hazardous." VR, 5/26/23, 11:08:02 *et seq*. The Estate did not object to the statement. Soon thereafter, P&L's counsel similarly argued that "[b]ecause she [Minton] did not exercise ordinary care for her own safety at the time of this accident, the railroad crossing on Blackrock Drive is not extra-hazardous." *Id.* at 11:09:55 *et seq*. Again, the Estate did not object.

A few minutes later, P&L's counsel asserted the crossing was not extra-hazardous "because 1) Mrs. Minton simply did not exercise ordinary care for her own safety on the day of this accident, and 2) the physical characteristics of it

make it so that you can see and look for and hear and observe trains in the event that you proceed up close to it." *Id.* at 11:17:21 *et seq.* The Estate did not object.

We disapprove of P&L's counsel's assertion that Minton's purported failure to exercise ordinary care removes the necessity of finding the crossing was extra-hazardous. As we have already discussed, it is the physical characteristics of a crossing and not the negligence of the driver which determines whether the crossing is extra-hazardous. *Piersall's Adm'r*, 203 S.W. at 553; *Wright*, 550 S.W.2d at 491; *Hargadon v. Louisville & N. R. Co.*, 375 S.W.2d 834, 838 (Ky. 1963).

P&L's counsel even recognized as much at one point, stating "[l]aying aside the issue of Ms. Minton's actions, in determining whether the railroad crossing is extra-hazardous you must also consider whether there was a real or substantial obstruction to sight or hearing that created an actual physical inability to see or hear this train in close proximity to the crossing." VR, 5/26/23, at 11:10:04.

We also must consider the extremely limited nature of the Estate's discussion of P&L's closing arguments. The Estate did not timely object to the misstatements made during P&L's closing arguments. Nor has the Estate raised a freestanding claim for relief based on the improper closing argument. In fact, the

-28-

Estate did not even mention P&L's closing argument in its opening brief.[13]  Plus, P&L's misstatements during its closing argument do not accurately mirror the actual language in the instructions, despite the Estate's assertions to the contrary.

Under these unique facts, we decline to address *sua sponte* whether the misstatements in P&L's closing argument, standing alone, were sufficiently egregious to entitle the Estate to palpable error relief under CR 61.02.

### B.  Case No. 2023-CA-1148-MR

We have concluded the Estate is not entitled to relief in its appeal. Therefore, the issues raised by P&L in its protective cross-appeal are moot.  The conclusion of P&L's opening brief states that "[i]n the event that the verdict is reversed, the Court should correct the foregoing matters, which will aid in an error-free retrial."  Appellee's Brief, at 49.  Similarly, the close of P&L's cross-reply brief asserts that we "should affirm the jury's verdict."  Cross-Reply Brief, at 7. As we are doing just that, we decline to address the issues P&L raised in its cross-appeal.

### III.  Conclusion

For the foregoing reasons, the Grayson Circuit Court is affirmed.

ALL CONCUR.

---

[13] We would decline to consider an argument for relief raised first in a reply brief.  *See, e.g.*, *Catron v. Citizens Union Bank*, 229 S.W.3d 54, 59 (Ky. App. 2006); *Seeger Enterprises, Inc. v. Town & Country Bank and Tr. Company*, 518 S.W.3d 791, 796 (Ky. App. 2017).

BRIEFS FOR APPELLANT/CROSS-APPELLEE:

Thomas H. Goff
Leitchfield, Kentucky

BRIEFS FOR APPELLEE/CROSS-APPELLANT:

David T. Riley
Paducah, Kentucky